Filed 5/5/14   Reposted to correct formatting; no change to opinion text

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

LUIS ANGEL GUTIERREZ,

      Defendant and Appellant.

S206365

Ct.App. 2/6 B227606

Ventura County
Super. Ct. No. 05051378-8

THE PEOPLE,

      Plaintiff and Respondent,

      v.

ANDREW LAWRENCE MOFFETT,

      Defendant and Appellant.

S206771

Ct.App. 1/5 A133032

Contra Costa County
Super. Ct. No. 05051378-8

The two 17-year-old offenders in these cases were convicted of special circumstance murder and sentenced to life imprisonment without the possibility of parole under Penal Code section 190.5, subdivision (b) (hereafter section 190.5(b)).  Section 190.5(b) provides that the penalty for 16- or 17-year-old juveniles who commit special circumstance murder "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."  For two decades, since *People v. Guinn* (1994) 28

Cal.App.4th 1130 (*Guinn*), section 190.5(b) has been construed by our Courts of Appeal and trial courts as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder.

After defendants were sentenced, the United States Supreme Court ruled that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments,' " relying extensively on differences between juveniles and adults with regard to their culpability and capacity for change. (*Miller v. Alabama* (2012) 567 U.S. __, __ [132 S.Ct. 2455, 2460] (*Miller*).) We granted review to determine whether a presumption in favor of a sentence of life without parole under section 190.5(b) violates the Eighth Amendment to the United States Constitution under the principles announced in *Miller*.

As explained below, we hold that section 190.5(b), properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole. We further hold that *Miller* requires a trial court, in exercising its sentencing discretion, to consider the "distinctive attributes of youth" and how those attributes "diminish the penological justifications for imposing the harshest sentences on juvenile offenders" before imposing life without parole on a juvenile offender. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].) Because the sentencing regime created by section 190.5(b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*, we find no constitutional infirmity with section 190.5(b) once it is understood not to impose a presumption in favor of life without parole.

Because the two defendants here were sentenced before *Miller* in accordance with the interpretation of section 190.5(b) prevailing at the time (see

2

*Guinn*, *supra*, 28 Cal.App.4th at p. 1142), we remand for resentencing in light of the principles set forth in *Miller* and this opinion.

## I.

We consolidated the two cases under review on our own motion. We begin with the background of each case.

## A.

On April 23, 2005, defendant Andrew Lawrence Moffett and codefendant Alexander Hamilton robbed a Raley's supermarket in Pittsburg and a Wells Fargo bank located inside the store. At the time, Moffett was 17 years old, and Hamilton was 18 years old.

Moffett enlisted a friend, Elijah Moore, to steal a getaway car in exchange for some marijuana. After driving the car to the Raley's parking lot, Moffett and Hamilton entered the store shortly before 5:47 p.m. wearing facial coverings and carrying semiautomatic handguns. Moffett approached a checkout stand manned by Rima Bosso, pointed his gun at her head, and demanded that she give him the money. Flustered, Bosso could not get the register drawer to open. Moffett put his gun against her left ear and said, "Come on, bitch. Come on, bitch. You're taking too fucking long." The drawer eventually opened, and Bosso put about $800 in a bag. While Moffett was robbing Bosso, Hamilton approached the counter of the Wells Fargo bank, pointed a gun in the direction of the two tellers, and demanded money. The tellers put $3,000 in a bag Hamilton was carrying.

Moffett and Hamilton ran out of the store and attempted to flee in the stolen car, but Hamilton soon crashed the vehicle into the back of a pickup truck parked on the street. Moffett and Hamilton then got out of the car and started running. Moffett told a neighbor who was chasing them, "Stop or I'll cap you, motherfucker." Moffett and Hamilton continued running through the yards of several homes near the Delta de Anza Regional Trail, scaling fences as they went.

3

Pittsburg Police Officers John Florance and Larry Lasater arrived at the Delta de Anza Regional Trail at 5:58 p.m. Officer Lasater saw a dark figure standing by a tree and called out, "Is that someone down there?" The figure disappeared into the greenery, and Officer Lasater gave chase. After running for some distance, Officer Lasater stopped, drew his weapon, and started walking toward where the figure had disappeared. Around this time, Officer Florance heard the sound of someone jumping over a fence. He then saw Officer Lasater point his gun downward and shout, "Show me your hands."

Hamilton, who was lying down in the bushes, fired several shots at Officer Lasater. One of the bullets shattered a vertebra in Officer Lasater's neck, and another went through his calf. When additional officers responded to the scene to assist Officer Lasater, Hamilton fired shots at them until he ran out of ammunition and was taken into custody. The wound to Officer Lasater's neck proved fatal.

Meanwhile, Moffett had jumped the fence adjacent to the site of the shooting and continued running through the neighborhood. At one point, a woman saw him about to enter her garage. She yelled, "no," and Moffett ran across the street. At around 6:35 p.m., officers discovered Moffett lying shirtless in a fetal position under a tree where he surrendered, saying, "don't kill me."

Following a joint trial with Hamilton, Moffett was convicted of one count of first degree murder, three counts of second degree robbery, and one count of driving a stolen vehicle. (Pen. Code, §§ 187, 211; Veh. Code, § 10851.) The jury also found true three felony-murder special-circumstance allegations, one killing of a peace officer special-circumstance allegation, and firearm use allegations as to the murder and robbery counts. (Pen. Code, §§ 190.2, subd. (a)(7) & (17), 12022.53, subd. (b).) On July 24, 2008, the trial court sentenced Moffett to life imprisonment without the possibility of parole on the murder count plus an additional 24 years on the remaining charges and enhancements.

4

Moffett appealed, and the Court of Appeal reversed the true finding on the peace officer special-circumstance allegation because "[t]here was no evidence that [Moffett] personally fired his own gun, and the prosecution's position after the close of evidence was that appellant had jumped the fence and fled the area by the time Hamilton fired the fatal shot. . . . [N]othing in the record suggests that he encouraged Hamilton to fire the shots or assisted him in doing so. . . . [T]here is no substantial evidence from which it can be inferred that appellant acted with an intent to kill . . . ." The Court of Appeal remanded the case so that the trial court could consider whether a sentence of life without parole was appropriate in light of the reversal of the peace officer special circumstance. The Court of Appeal also directed the trial court to correct sentencing errors on the robbery counts.

On remand, defense counsel argued that sentencing Moffett to life without parole would constitute cruel and unusual punishment because Moffett was a juvenile and lacked any intent to kill, and therefore had "twice diminished moral culpability." (*Graham v. Florida* (2010) 560 U.S. 48, 69 (*Graham*).)

On July 22, 2011, the trial court resentenced Moffett to the same term of life without parole plus 24 years. Applying section 190.5(b), the trial court framed the issue as whether it should "deviate from the statutory requirement of life without the possibility of parole and sentence Mr. Moffett to a determinate term of 25 years to life." The trial court declined to "engage in a philosophical discussion about [the] merits . . . of the law in California" and observed that the law "provides discretion for the trial court in certain limited circumstances such as this where the defendant in a capital case was a juvenile tried as an adult."

In resentencing Moffett to life without parole, the trial court said: "Mr. Moffett was under the age of eighteen by just a few months at the time of this incident, thus the court has discretion regarding sentencing. [¶] . . . [¶] Sometimes with the passage of time, people tend to forget or minimize the impact

5

of incidents such as this. But the impact is just as vivid and continues for the victims and the victims' families and that doesn't change. [¶] The testimony of Rima Bosso, the robbery victim in Count 2, was extremely profound. She testified that the individual who was later identified as Mr. Moffett, took his gun, put it to her head and threatened to kill her with it. Not only did she see her own death that day, but she said for years afterwards and up until and as of the day she testified in the trial, she lived in a house where the curtains were pulled shut, the doors were locked. She didn't go out. She was fearful day and night. The trauma damaged her relationship with her family. It has changed her life profoundly and forever. She will never be the same. The fact that she was not physically harmed does not mean that she was not profoundly affected. Her testimony was very compelling. [¶] The other two robbery victims described similar experiences. I take all of this into account in determining the appropriate sentence.

"As for Officer Lasater's family, there's probably no way to describe in words the traumatic effect of this event, nor on the larger community that he was a part of. Mr. Moffett was very actively — he very actively participated in a series of events, starting with the theft of the car at his request by Elijah Moore; the takeover style robbery of the Raley's store and the bank window; the wild drive and crash in a nearby neighborhood; the confrontation of a resident where Mr. Moffett told him, 'Stop or I'll cap you'; and the shooting of Officer Lasater by Mr. Hamilton shortly thereafter. [¶] Mr. Moffett's role was not a passive role nor was he a peripheral player as compared with those factual scenarios described in the cases cited by the defense in their sentencing memorandum.

"I will note that although we don't know exactly where Mr. Moffett was when Mr. Hamilton shot Officer Lasater, the police found gun residue on Mr. Moffett's hands, meaning that even if he did not fire the weapon, he was close to it when it was fired; shoe prints matching Mr. Moffett's ten feet away from where

Officer Lasater fell; and Mr. Moffett's cell phone a few feet away from Officer Lasater. [¶] The actions taken that day by Mr. Moffett are not those of someone who didn't know what was going on or who was led by others.

"I've also considered Mr. Moffett's juvenile criminal history. There were four entries, including a felony, 245(a)(1) Penal Code, assault with a deadly weapon. It was noted that his performance on probation was marginal at best. The juvenile justice system has infinitely more resources than the adult system. And it appears those resources were not sufficiently taken advantage of to choose a different path.

"The actions taken by Mr. Moffett on the day of this event were not those of an irresponsible child. They were the very adult, very violent acts of a young man who showed no regard for the impact of his actions on the victim in this case. I might add that his actions on that day also have had a profound effect and directly affected his own family and loved ones. Although Mr. Moffett was slightly under eighteen years old at the time, his actions on that day, coupled with his criminal history, do not support, in my opinion, this Court exercising [its] discretion and sentencing him to a determinate term of twenty-five years to life. I do not find that sentence appropriate in this particular case under the circumstances of this case, taking into account everything that is in front of me. [¶] On Count 1, I will sentence Mr. Moffett to life without the possibility of parole."

Moffett again appealed. He argued, among other things, that a sentence of life without parole amounted to cruel and unusual punishment because he was not the actual shooter, did not intend to kill, and was a juvenile at the time he committed his crimes. He also argued that the trial court abused its discretion when it declined to impose the lesser sentence of 25 years to life under section 190.5(b).

After briefing was complete, the United States Supreme Court issued its decision in *Miller*, holding that mandatory life without parole for juveniles who commit murder violates the Eighth Amendment. In a supplemental brief discussing the impact of *Miller*, Moffett argued that the trial court had employed an unconstitutional presumption in favor of life without parole when exercising its sentencing discretion under section 190.5(b).

The Court of Appeal vacated Moffett's sentence and again remanded for resentencing. The Court of Appeal acknowledged that "[s]ection 190.5, subdivision (b) differs from the mandatory schemes found unconstitutional in *Miller*, because it gives the court the discretion to impose a term that affords the possibility of parole in lieu of an LWOP [life without parole] sentence." Nevertheless, the Court of Appeal reasoned, because section 190.5(b) has been judicially construed to establish a presumption in favor of life without parole, the statute "is contrary to the spirit, if not the letter, of *Miller*, which cautions that LWOP sentences should be 'uncommon' given the 'great difficulty . . . of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." ' " "Though *Miller* did not categorically bar LWOP sentences in juvenile homicide cases," the Court of Appeal observed, "it recognizes that juveniles are different from adults in ways that 'counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.] Treating LWOP as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole."

The Court of Appeal remanded the case to allow the trial court to consider "the appropriate sentence on the murder count without reference to a presumption

8

in favor of LWOP." Further, the Court of Appeal said, "[o]ther comments by the court at the resentencing hearing convince us that remand is appropriate." The Court of Appeal noted that "a juvenile who ' "did not kill or intend to kill has a twice diminished moral culpability" ' " and instructed the trial court to "give appropriate weight to the fact that [Moffett] was a non-killer convicted under the felony-murder rule." (Quoting *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468], quoting *Graham*, *supra*, 560 U.S. at p. 69.) The Court of Appeal also observed that "the trial court placed great reliance on the trauma caused to the robbery victims" but cautioned that "the psychological reactions of the robbery victims do not say much about [Moffett's] maturity, prospects for reform, or mental state with respect to the homicide itself — the factors paramount under *Miller*." Finally, the Court of Appeal observed that the trial court, in describing Moffett's criminal history, had "mistakenly characterized a juvenile adjudication for assault as a felony, when it was designated a misdemeanor."

**B.**

On March 16, 2008, defendant Luis Angel Gutierrez was 17 years old and lived with relatives in Simi Valley. (In reciting these facts, we refer to members of the Gutierrez family, including defendant, by their first names in order to avoid confusion. Elsewhere we refer to defendant as Gutierrez.) Around 4:20 a.m., Luis's uncle, Abel Gutierrez, left for work. Abel's wife, Josefina Gutierrez, was asleep in their bed. Around 6:30 a.m., Abraham Gutierrez, Abel's nephew, heard someone open Josefina's bedroom door, which was unusual because Josefina normally slept late. Abraham got up, walked in the direction of the room, and saw Luis in the kitchen. Abraham noticed Luis's hand was bleeding and asked him what had happened. Luis said he had hurt his hand in a fight. Luis left the house about five minutes later.

9

José Luis Mendoza, Josefina's brother, later awoke and noticed blood on the floor of the living room and in the hallway leading to Abel and Josefina's bedroom. He opened the door and found Josefina's body lying facedown on the floor. A large knife protruded from her back, and there were 28 stab wounds in her back, side, stomach, face, neck, and fingers. There were also fresh bruises on her face and body. The cause of death was blood loss due to multiple stab wounds.

Luis sustained a severe wound to his hand and was admitted to the hospital for treatment. A sexual assault nurse examined Luis and found blood on the head of his penis, blood between his toes, and several hairs and fibers adhering to the bottom of his feet. Subsequent DNA testing connected Luis to the crime scene and to Josefina. A blood pattern analyst who viewed photographs of Josefina's body saw a bloodstain on her back that might have been an imprint or a swipe, and it was possible that the shape was consistent with an erect male penis. A sperm fraction found on Josefina's body included a match to her husband, and Luis was excluded as a contributor to the sample. But Luis could not be eliminated as a contributor to a mixture of nonsperm DNA found on Josefina's perianal area, inner thighs, and buttocks.

In an interview with police, Luis first denied any involvement in Josefina's death. He eventually acknowledged having a confrontation with Josefina and said that she had stabbed him and herself, and that she took off her own nightshirt and his pants because she wanted him to have sex with her. Luis told officers that after Josefina stabbed him, he stabbed her in the back about three times.

A jury convicted Luis of first degree murder with a special circumstance finding that the murder was committed during the commission of a rape or attempted rape. (Pen. Code, §§ 187, subd. (a), 189, 190.2, subd. (a)(17)(C), 261.) The jury found true the allegation that defendant personally used a deadly weapon

10

(*id.*, § 12022, subd. (b)(1)) and was over 14 years of age at the time of the offense (Welf. & Inst. Code, § 602, subd. (b)(1)).

During the sentencing hearing on August 23, 2010, defense counsel urged the trial court to "allow [Luis] a chance at parole after 25 years . . . because of his age." Noting that "25 years would place [Luis] in his late forties," counsel argued that at that point "[t]here would be a very much closer predictability to his likelihood of reoffense." Counsel further argued that a sentence of 25 years to life would be adequate to protect society and "to address this horrible thing that he did."

The trial court sentenced defendant to life without parole plus one year on the weapon enhancement. In pronouncing the sentence, the trial court said: "[T]he Court has been concerned throughout the trial about the defendant's age and the age [at] which he committed this horrific crime. [¶] And I have considered all of the legal options that are limited for the Court with this conviction, but I have considered all of them and there are a number of things about the crime itself that in my view warrants life without the possibility of parole, notwithstanding the defendant's age. [¶] First and foremost is really just the true horror that was involved and the amount of violence that was inflicted on Josefina is really inexplicable. And there isn't, other than the rape special circumstance, there isn't any rational[] explanation as to how the defendant could have found himself in this position. [¶] He has devastated this family and her children and her husband, and there is really no amount of time that could be imposed as punishment that would repay the damage he has caused, not just to her inner circle but to the community as well and the community of her family.

"In addition to the crime itself, I will note, as pointed out in the probation officer's report, that his behavior in custody thus far hasn't really demonstrated that he will do anything but continue to get written up. And the probation officer's

11

report indicates that he has had ten major write-ups in custody for failing to obey the rules, deception, possession of contraband, including alcohol, which perhaps his substance abuse is perhaps the only thing that I can look to that might possibly give some explanation as to why a young man can find himself in such a horrific situation, horrific situation.

"So I thought — I have thought long and hard about what punishment is appropriate and I am absolutely convinced at this stage of the proceedings that life without the possibility of parole is the only thing that the Court can do that could redress the amount of violence that was inflicted in this case."

Luis appealed his conviction and sentence. After the high court decided *Miller*, Luis filed supplemental briefing in the Court of Appeal arguing, among other things, that his life without parole sentence should be vacated and the case remanded for the trial court to resentence him with full consideration of the factors deemed relevant in *Miller* and without adherence to California case law holding that life without parole is the "presumed sentence" under section 190.5(b).

The Court of Appeal held that Luis had forfeited his right to challenge his sentence as cruel and unusual punishment by failing to object on that ground in the trial court. But, the Court of Appeal continued, even if Luis had raised the issue, his claim would still fail because a sentence of life without parole under section 190.5(b) does not violate the Eighth Amendment as construed by *Miller*. "Unlike *Miller*," the Court of Appeal said, "[Luis's] LWOP sentence was not mandatory. [Luis] was sentenced pursuant to section 190.5, subdivision (b), which provides that a juvenile defendant 16 years of age or older who is convicted of first degree, special circumstance murder *may be* sentenced to life without possibility of parole. [Citation.] The statute does not require a mandatory LWOP sentence and vests sentencing courts with the discretion to sentence the defendant to a term of 25 years to life with possibility of parole." (Italics in original.) Because the trial

12

court was aware of its discretion to sentence Luis to a lesser sentence, the Court of Appeal concluded, remanding for resentencing in light of *Miller* would be futile.

## II.

We granted review in these cases to determine whether a presumption in favor of a sentence of life without parole under section 190.5(b) violates the Eighth Amendment under the principles announced in *Miller*.  As an initial matter, we reject the Attorney General's contention that Gutierrez forfeited his Eighth Amendment claim by failing to raise it in the trial court.  At sentencing, Gutierrez did object to the imposition of life without parole and requested a sentence of 25 years to life.  Although he did not mention the Eighth Amendment, this is unsurprising because at the time the high court had not yet granted review in *Miller* and no court had even held that a *mandatory* sentence of life without parole for juveniles convicted of homicide was unconstitutional.  After *Miller* was decided, Gutierrez promptly asserted his Eighth Amendment claim in the Court of Appeal, which fully considered the claim, and he now reasserts that claim in this court.  Given these circumstances, and because his Eighth Amendment challenge involves a question of law, we exercise our discretion to consider it here.  (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

## A.

The parties have asked us to decide a constitutional issue arising from the fact that our appellate and trial courts have long construed section 190.5(b) as establishing a presumption in favor of life without parole for juveniles convicted of special circumstance murder.  But we have never examined whether this construction of section 190.5(b) is correct as a matter of statutory interpretation.

"In construing statutes, 'our fundamental task is "to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." [Citations.]  We begin by examining the statutory language because it generally is the most reliable

13

indicator of legislative intent.  [Citation.]  We give the language its usual and ordinary meaning, and "[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs."  [Citation.] If, however, the statutory language is ambiguous, "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history."  [Citation.]  Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute.  [Citations.]' "  (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)  With these principles in mind, we discuss how section 190.5(b) has been interpreted by the Courts of Appeal and assess that interpretation in light of the text and history of the statute.

Section 190.5(b) provides:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

For two decades, the Courts of Appeal have uniformly interpreted section 190.5(b) as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance murder.  The leading case is *Guinn*, *supra*, 28 Cal.App.4th 1130. There, after the jury convicted a juvenile offender of first degree murder and found true a robbery-murder special circumstance, the trial court sentenced the defendant to life without parole pursuant to section 190.5(b).  (*Guinn*, at p. 1140.)  On appeal, the defendant argued that "in the absence of specific guidelines [under section 190.5(b)], LWOP will be arbitrarily and capriciously imposed, in violation of the guarantees against cruel and unusual punishment."  (*Id.* at p. 1141.)

14

In rejecting the defendant's argument, *Guinn* held that the trial court's sentencing discretion was appropriately circumscribed under section 190.5(b) and that life without parole was the presumptive sentence for a juvenile convicted of special circumstance murder. The court explained: "We believe Penal Code section 190.5 means . . . that 16- or 17-year-olds who commit special circumstance murder *must* be sentenced to LWOP, *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life. Our construction is based on the ordinary language and structure of the provision; in context, the word 'shall' appears to be mandatory. In addition, this construction is consistent with the history of Penal Code section 190.5, enacted as part of Proposition 115, the 'Crime Victims Justice Reform Act.' Under the former law, youthful offenders were exempted from application of the death penalty provisions. They also were excluded from application of the special-circumstance proceedings under Penal Code section 190.4, so that murderers under age 18 tried as adults were subject neither to the death penalty nor to LWOP. [Citation.] Penal Code section 190.5 was amended specifically to make youthful offenders, who committed what would have been a death-eligible crime for an adult, subject to special circumstances and LWOP. The fact that a court might grant leniency in some cases, in recognition that some youthful special circumstance murderers might warrant more lenient treatment, does not detract from the generally mandatory imposition of LWOP as the punishment for a youthful special circumstance murderer. In the first instance, therefore, LWOP is the presumptive punishment for 16- or 17-year-old special-circumstance murderers, and the court's discretion is concomitantly circumscribed to that extent." (*Guinn*, *supra*, 28 Cal.App.4th at pp. 1141–1142.)

The court in *Guinn* went on to reject the claim that section 190.5(b) "authorize[s] the court to act arbitrarily and capriciously, based on the asserted lack of guidelines for exercise of the court's discretion." (*Guinn*, *supra*, 28

Cal.App.4th at p. 1142.) *Guinn* concluded that "the factors stated in section 190.3 are available, to the extent relevant to an exercise of discretion to grant leniency, as guidelines under section 190.5. Because those factors allow the court to take into account any mitigating circumstance which extenuates the gravity of the crime (factor (k)), by extension the criteria stated under California Rules of Court, rule 423 [now rule 4.423], are also available as guidelines for the court's exercise of discretion." (*Id.* at pp. 1142–1143.)

Subsequent cases predating *Miller* have followed *Guinn*'s reading of section 190.5(b). (See, e.g., *People v. Murray* (2012) 203 Cal.App.4th 277, 282; *People v. Blackwell* (2011) 202 Cal.App.4th 144, 159; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089 (*Ybarra*).)

Contrary to *Guinn*, however, our review of the text and history of section 190.5(b) does not lead us to conclude that the statute establishes a presumption in favor of life without parole. The text of the statute appears ambiguous on this point. As noted, section 190.5(b) says the penalty for special circumstance murder committed by a 16- or 17-year-old offender "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." It is not unreasonable to read this text, as *Guinn* did, to mean that a court "shall" impose life without parole unless "at the discretion of the court" a sentence of 25 years to life appears more appropriate. (See *Guinn*, *supra*, 28 Cal.App.4th at pp. 1142, 1145.) But it is equally reasonable to read the text to mean that a court may select one of the two penalties in the exercise of its discretion, with no presumption in favor of one or the other. The latter reading accords with common usage. For example, if a teacher informed her students that "you must take a final exam or, at your discretion, write a term paper," it would be reasonable for the students to believe they were equally free to pursue either

16

option. The text of section 190.5(b) does not clearly indicate whether the statute was intended to make life without parole the presumptive sentence.

In her briefing, the Attorney General contends that a presumption in favor of life without parole is the only "logical" interpretation of section 190.5(b) because in the context of the penalty scheme applicable to 16 and 17 year olds convicted of murder, "LWOP is the only penalty that is available to punish special circumstance murderers more harshly than first degree murderers." But there is nothing illogical about making life without parole an *available* penalty for juveniles convicted of special circumstance murder without also making it the *presumptive* penalty. It is reasonable for a policymaker to believe that special circumstance murder should expose a juvenile offender to life without parole — thereby differentiating such an offender from a juvenile who commits first degree murder with no special circumstance — while also believing that imposition of that penalty as opposed to 25 years to life, which is the penalty for first degree murder (Pen. Code, § 190, subd. (a)), should be decided case by case with no default preference. The structure of the penalty scheme, like the text of section 190.5(b), does not clearly indicate a presumption in favor of life without parole.

Nor does legislative history resolve the ambiguity. As the Attorney General acknowledged at oral argument, nothing in the legislative history supports *Guinn*'s interpretation of section 190.5(b). The statute was enacted in 1990 as part of Proposition 115, the Crime Victims Justice Reform Act. (See Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, p. 33 (Ballot Pamphlet); see also *People v. Marquez* (1992) 1 Cal.4th 553, 582 (*Marquez*).) Before Proposition 115, juvenile offenders convicted of first degree murder could not be charged with special circumstances and thus were not subject either to the death penalty or to life without parole. (See *Marquez*, at p. 582; *People v. Spears* (1983) 33 Cal.3d 279, 280–283; *People v. Davis* (1981) 29 Cal.3d 814, 831; see also Cal. Dept. of

17

Justice, 1990 Crime Victims Justice Reform Initiative:  Proposition 115 Manual (1990), at p. 159.)  Although juvenile offenders remain ineligible for the death penalty (Pen. Code, § 190.5, subd. (a)), Proposition 115 amended section 190.5 to make clear that juvenile offenders convicted of first degree murder can be charged with special circumstances and are subject to life without parole if convicted of special circumstance murder.  (See Sen. Com. on Judiciary, Staff Analysis of Crime Victims Justice Initiative (Dec. 11, 1989) pp. 77–78; see also *Review of Selected 1990 California Legislation—Addendum* (1991) 22 Pac. L.J. 1010, 1014 [reviewing Prop. 115].)  The stated purpose of the initiative was to "to restore balance to our criminal justice system, to create a system in which justice is swift and fair, and to create a system in which violent criminals receive just punishment, in which crime victims and witnesses are treated with care and respect, and in which society as a whole can be free from the fear of crime in our homes, neighborhoods, and schools."  (Ballot Pamphlet, text of Prop. 115, p. 33.)

Thus, Proposition 115 was intended to toughen penalties for juveniles convicted of first degree murder by making them eligible for life without parole upon a finding of one or more special circumstances.  However, neither the text of the initiative, the summary prepared by the Attorney General, the analysis prepared by the Senate Office of Research, nor the voters' pamphlet provides any indication whether the initiative was intended to make life without parole the presumptive sentence.  The analysis by the Senate Office of Research merely stated that section 190.5(b) is intended "to provide a sentence of life without parole or 25 to Life for a 16–18 year old . . . ."  (Sen. Off. of Research, June 1990 Ballot: Analysis of Propositions (Mar. 1990) p. 46.)  Similarly, the ballot pamphlet described Proposition 115 as "[a]llow[ing] minors who are 16 or 17 years of age at the time of the crime . . . to be punished by life imprisonment *without* the possibility of parole."  (Ballot Pamphlet, *supra*, analysis of Prop. 115 by Legis.

18

Analyst, p. 32, italics in original; see also Prop. 115, as approved by voters, Primary Elec. (June 5, 1990); Cal. Dept. of Justice, Crime Victims Justice Reform Initiative: Proposition 115 Manual, *supra*, at pp. 159–160; Ballot Pamphlet, argument in favor of Prop. 115, p. 34.) Nothing in the legislative history provides a basis to conclude that section 190.5(b) was intended to create a presumption in favor of life without parole.

We conclude that the text and history of section 190.5(b) are ambiguous as to whether the statute establishes a presumption in favor of life without parole. We turn now to consider whether other principles of statutory interpretation resolve the ambiguity.

**B.**

When a question of statutory interpretation implicates constitutional issues, we are guided by the precept that " '[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable.' " (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548; see *People v. Leiva* (2013) 56 Cal.4th 498, 506–507 (*Leiva*) ["[W]e adhere to 'the precept "that a court, when faced with an ambiguous statute that raises serious constitutional questions, should endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity." ' "].) This rule, called the canon of constitutional doubt (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 249 (Scalia & Garner)), has been described as a "cardinal principle" of statutory interpretation that "has for so long been applied . . . that it is

19

beyond debate." (*Debartolo Corp. v. Florida Gulf Coast Bldg. & Construction Trades Council* (1988) 485 U.S. 568, 575.)

The canon reflects "a judgment that statutes *ought not* to tread on questionable constitutional grounds unless they do so clearly" as well as "a judgment that courts should minimize the occasions on which they confront and perhaps contradict the legislative branch." (Scalia & Garner, *supra*, at p. 249.) It applies whenever "the Government's view would raise serious constitutional questions on which precedent is not dispositive" (*Jones v. United States* (1999) 526 U.S. 227, 251 (*Jones*)) and "whether the cases raising the constitutional doubt antedate or postdate a statute's enactment" (Scalia & Garner, at p. 249). But the canon "is qualified by the proposition that 'avoidance of a difficulty will not be pressed to the point of disingenuous evasion.' " (*Rust v. Sullivan* (1991) 500 U.S. 173, 191.)

Applying this canon, we have repeatedly construed penal laws, including laws enacted by initiative, in a manner that avoids serious constitutional questions. (See *Leiva*, *supra*, 56 Cal.4th at p. 509 [construing probationary period tolling provision "to avoid doubts concerning its constitutional validity"]; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509–519 (*Romero*) [applying the canon in interpreting the scope of judges' power to strike allegations of prior convictions under the "Three Strikes" law]; *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1074 [declining to construe Prop. 115 as allowing multiple hearsay testimony because of "constitutional questions that we can and should avoid"]; *People v. Smith* (1983) 34 Cal.3d 251, 259–262 [construing Prop. 8's changes to the rules of evidence in criminal trials as applying only to crimes committed after its effective date in order to avoid ex post facto concerns]; accord, *Jones*, *supra*, 526 U.S. at pp. 239–240 [applying the canon in holding that facts that increase defendants' sentences under the federal carjacking statute are elements of the

20

crime that must be charged and proven beyond a reasonable doubt].)  In deciding which of two or more reasonable interpretations of a penal statute to adopt, our analysis is "necessarily inform[ed]" by constitutional concerns.  (*Romero*, at p. 509.)  We adopt the less constitutionally problematic interpretation of a penal statute so long as that interpretation is "reasonably possible."  (*Id.* at p. 513.)  In light of this principle, we must examine whether the *Guinn* presumption raises a serious question under the Eighth Amendment.

**1.**

The Eighth Amendment provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  This constitutional provision "guarantees individuals the right not to be subjected to excessive sanctions."  (*Roper v. Simmons* (2005) 543 U.S. 551, 560 (*Roper*).)  This right "flows from the basic ' "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' "  (*Ibid.*)  To determine whether a punishment is cruel and unusual, and thus violative of the Eighth Amendment, "courts must look beyond historical conceptions to ' "the evolving standards of decency that mark the progress of a maturing society." '  [Citations]."  (*Graham*, *supra*, 560 U.S. at p. 58.)  "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change.' "  (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419.)

In *Miller*, the high court considered whether sentencing schemes mandating life without parole for juveniles convicted of homicide offenses violate the Eighth Amendment.  Each of the two cases in *Miller* involved a 14-year-old offender who was tried as an adult, convicted of murder, and sentenced to life without parole pursuant to a state law providing the sentencing authority with no discretion to impose a lesser punishment.  The constitutionality of mandatory life without

21

parole for juvenile homicide offenders, *Miller* explained, "implicate[s] two strands of precedent reflecting our concern with proportionate punishment." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2463].)

The first strand of relevant precedent, according to *Miller*, consists of "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. [Citation.] So, for example, we have held that imposing the death penalty for nonhomicide crimes against individuals, or imposing it on mentally retarded defendants, violates the Eighth Amendment. See *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Atkins v. Virginia*, 536 U.S. 304 (2002). Several of the cases in this group have specially focused on juvenile offenders, because of their lesser culpability. Thus, *Roper* held that the Eighth Amendment bars capital punishment for children, and *Graham* concluded that the Amendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2463].)

Focusing extensively on *Roper* and *Graham*, the high court in *Miller* explained that those cases "establish that children are constitutionally different from adults for purposes of sentencing" in three important ways. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2464].) "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.]" (*Ibid.*) For these reasons, "juveniles have diminished

22

culpability and greater prospects for reform," and are thus " 'less deserving of the most severe punishments.' [Citation.]" (*Ibid.*)

*Miller* further observed: "Our decisions [in *Roper* and *Graham*] rested not only on common sense—on what 'any parent knows'—but on science and social science as well. [Citation.] In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." ' [Citation.] And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' [Citation.] We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequence—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' [Citation.]" (*Miller*, *supra*, 567 U.S. at pp. __–__ [132 S.Ct. at pp. 2464–2465, fn. omitted.) "The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger." (*Miller*, at p. __, fn. 5 [132 S.Ct. at p. 2464, fn. 5]; see *ibid.* [" 'It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance' "], quoting brief for Am. Psychological Assn. et al. as amici curiae, p. 4.)

*Miller* went on to explain that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because ' "[t]he heart of the retribution rationale" ' relates to an offender's blameworthiness, ' "the case for retribution is not as strong with a minor as with an adult." ' [Citations.] Nor can

deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment.  [Citation.] Similarly, incapacitation could not support the life-without-parole sentence in *Graham*:  Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but ' "incorrigibility is inconsistent with youth." '  [Citation.]  And for the same reason, rehabilitation could not justify that sentence.  Life without parole 'forswears altogether the rehabilitative ideal.'  [Citation.]  It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change."  (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465]; see *Graham*, *supra*, 560 U.S. at p. 79 ["Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope.  Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation."].)

Further, although *Graham* addressed whether juveniles could be sentenced to life without parole for nonhomicide offenses, "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.  Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile . . . ."  (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].)

*Miller* then turned to the second strand of relevant precedent.  *Graham*, the high court observed, "likened life without parole for juveniles to the death penalty itself . . . ."  (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2463].)   "Life-without-parole terms . . . 'share some characteristics with death sentences that are

24

shared by no other sentences.' [Citation.] Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' [Citation.] And this lengthiest possible incarceration is an 'especially harsh punishment for a juvenile,' because he will almost inevitably serve 'more years and a greater percentage of his life in prison than an adult offender.' [Citation.] The penalty when imposed on a teenager, as compared with an older person, is therefore 'the same . . . in name only.' " (*Id.* at p. __ [132 S.Ct. at p. 2466].) "*Graham*'s '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,' " the high court explained, makes relevant a line of precedent "demanding individualized sentencing when imposing the death penalty." (*Id.* at p. __ [132 S.Ct. at p. 2467].)

Beginning with *Woodson v. North Carolina* (1976) 428 U.S. 280, several high court decisions "have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467].) These decisions "insisted . . . that a sentencer have the ability to consider the 'mitigating qualities of youth,' " including the " 'transient' " qualities emphasized in *Roper* and *Graham*: "immaturity, irresponsibility, 'impetuousness[,] and recklessness,' " as well as " 'susceptib[ility] to influence and to psychological damage.' " (*Miller*, at p. __ [132 S.Ct. at p. 2467].) "In light of *Graham*'s reasoning," *Miller* said, "these decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." (*Ibid.*) Just as the failure to consider such factors "would be strictly forbidden" in meting out the death

25

penalty, "*Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison." (*Id.* at p. __ [132 S.Ct. at p. 2468].)

"To recap:  Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.]  And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468].)

Based on "the confluence of these two lines of precedent" — which establish that juvenile offenders are less culpable and more susceptible to reform than adults, and that imposition of the harshest punishment on a juvenile requires individualized sentencing that takes into account an offender's "youth (and all that accompanies it)" — the high court in *Miller* held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller*, *supra*, 567 U.S. at pp. __, __ [132 S.Ct. at pp. 2464, 2469].)

Because that holding was sufficient to decide the two cases at issue in *Miller*, the high court did not consider the "alternative argument that the Eighth

26

Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) But *Miller* concluded with the following caution: "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Ibid*.)

We recently applied the principles of *Miller* and *Graham* in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) to hold that an aggregate determinate sentence of over 100 years violated *Graham*'s requirement that "a state must provide a [nonhomicide] juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Caballero*, at p. 268, quoting *Graham*, *supra*, 560 U.S. at p. 82.) The Attorney General had argued in *Caballero* that because *Graham* involved a sentence of life without parole, *Graham*'s reasoning does not apply to a determinate sentence, even when the sentence would have the practical effect of keeping a juvenile behind bars without the possibility of parole for the rest of his life. We rejected the Attorney General's narrow interpretation of *Graham*, observing that *Miller* had "extended *Graham*'s reasoning (but not its categorical ban) to homicide cases, and, in so doing, made it clear that *Graham*'s 'flat ban' on life without parole sentences for juvenile offenders in nonhomicide cases applies to their sentencing equation

27

regardless of intent in the crime's commission, or how a sentencing court structures the life without parole sentence." (*Caballero*, at p. 267.) *Caballero* highlighted *Miller*'s and *Graham*'s observations concerning the differences between children and adults that limit the constitutional validity of life without parole for juvenile offenders. (*Caballero*, at pp. 266, 267, 268, fn. 4.) But *Caballero* "le[ft] *Miller*'s application in the homicide context to a case that poses the issue." (*Id.* at p. 268, fn. 4.) That issue is presented here.

**2.**

Under *Miller*, a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*. Unlike the sentencing laws at issue in *Miller*, section 190.5(b) is discretionary and does not mandate life without parole for juvenile homicide offenders. California's individualized, discretionary sentencing of juvenile homicide offenders differs in significant ways from the mandatory sentencing scheme at issue in Miller. Nevertheless, in light of *Miller*'s reasoning, a sentence of life without parole under section 190.5(b) would raise serious constitutional concerns if it were imposed pursuant to a statutory presumption in favor of such punishment.

At the core of *Miller*'s rationale is the proposition — articulated in *Roper*, amplified in *Graham*, and further elaborated in *Miller* itself — that constitutionally significant differences between children and adults "diminish the penological justifications for imposing the harshest sentences on juvenile offenders." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].) The high court said in plain terms that because of "children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Id.* at p. __ [132 S.Ct. at p. 2469].) "That is especially so because of the great difficulty . . . of

28

distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Ibid.*)

Reading section 190.5(b) to establish a presumption in favor of life without parole — i.e., a rule that "16- or 17-year-olds who commit special circumstance murder *must* be sentenced to LWOP, *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life" (*Guinn*, *supra*, 28 Cal.App.4th at p. 1141, italics in original) — is in serious tension with the foregoing statements in *Miller*. As the Court of Appeal explained in Moffett's case: "Treating [life without parole] as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole."

The Attorney General resists this conclusion on several grounds. First, she contends that a presumptive sentence of life without parole under section 190.5(b) does not raise constitutional concerns under *Miller* because the statute limits its applicability to 16 and 17 year olds who are convicted of special circumstance murder. But neither the limitation to older juveniles nor the limitation to certain types of murder, singly or together, eliminates the constitutional concerns raised by the *Guinn* presumption.

"Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach." (*Roper*, *supra*, 543 U.S. at p. 574.) But "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood" (*ibid.*), and that is the line the high court has drawn in its Eighth Amendment

29

jurisprudence. The high court in *Miller*, which considered two cases involving 14 year olds convicted of murder, could have limited its concerns about juveniles' lessened culpability and greater capacity for reform to younger juveniles. But *Miller* declined to adopt any such limitation, instead citing evidence that developmental immaturity persists through late adolescence. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2464], citing Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and Juvenile Death Penalty* (2003) 58 Am. Psychologist 1009, 1014; see *Caballero*, *supra*, 55 Cal.4th at p. 266.) The high court reasoned that persons under the age of 18, as a category, have distinctive attributes that typically counsel against imposition of life without parole. (*Miller*, at pp. __–__ [132 S.Ct. at pp. 2464–2466].) Of course, a sentencing court has discretion under *Miller* to decide on an individualized basis whether a 16- or 17-year-old offender is a " 'rare juvenile offender whose crime reflects irreparable corruption.' " (*Id.* at p. __ [132 S.Ct. at p. 2469]; see *id.* at p. __ [132 S.Ct. at p. 2467] ["sentencer" may take account of difference between "the 17-year-old and the 14-year-old"].) But to say that *all* 16 or 17 year olds subject to section 190.5(b) presumptively deserve a sentence of life without parole is in serious tension with *Miller*'s categorical reasoning about the differences between juveniles and adults.

Further, *Miller* made clear that its concerns about juveniles' lessened culpability and greater capacity for reform have force independent of the nature of their crimes. Of course, the nature of the crime is a factor for the "sentencer" to consider in each case. (See *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467] ["sentencer" may take account of difference between "the shooter and the accomplice"].) But *Miller* said "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." (*Id.* at p. __ [132 S.Ct. at

30

p. 2465], italics added.)  And in declining to limit *Graham*'s reasoning to nonhomicide offenses, the high court explained that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.  Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing.  So *Graham*'s reasoning implicates *any* life-without-parole sentence imposed on a juvenile . . . ."  (*Miller*, at p. __ [132 S.Ct. at p. 2465], italics added; see *Caballero*, *supra*, 55 Cal.4th at p. 267.)  *Graham* and *Roper* likewise indicated that the mitigating features of youth can be dispositively relevant, whether the crime is a nonhomicide offense or a heinous murder punishable by death if committed by an adult.  (See *Graham*, *supra*, 560 U.S. at p. 78 ["an 'unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a [lesser] sentence' "], quoting *Roper*, *supra*, 543 U.S. at p. 573.)  Although section 190.5(b) does not apply to every murder offense, it applies to a broad and diverse range of first degree murder offenses.  (See Pen. Code, §§ 190.2, 190.25.)  To presume that all such offenses committed by 16 and 17 year olds merit a presumptive penalty of life without parole cannot be easily reconciled with *Miller*'s principle that "the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders" are not "crime-specific."  (*Miller*, at p. __ [132 S.Ct. at p. 2465].)

In sum, while requiring "factfinders" in individual cases "to take into account the differences among defendants and crimes" (*Miller*, *supra*, 567 U.S. at p. __, fn. 8 [132 S.Ct. at p. 2469, fn. 8]), *Miller* nowhere suggested that legislatures may presume life without parole to be the proper punishment for entire

31

categories of juvenile offenders or offenses. Instead, *Miller* made clear that its concerns about imposing life without parole have applicability whatever the age or crime of a juvenile offender. A presumption in favor of life without parole for a subgroup of juveniles who commit any one of a subgroup of crimes would raise a serious constitutional question under *Miller*.

Second, the Attorney General contends that a presumption in favor of life without parole under section 190.5(b) presents no constitutional difficulty because the statute affords the sentencing court discretion to consider the defendant's age, among other potentially mitigating factors, and to impose a sentence of 25 years to life if appropriate. It is true that a presumption in favor of life without parole does not eliminate a trial court's discretion to make an individualized sentencing decision. (See *Ybarra*, *supra*, 166 Cal.App.4th at p. 1089 [§ 190.5(b) " 'evidences a preference for the LWOP penalty.' [¶] Despite that statutory preference, section 190.5, subdivision (b) requires 'a proper exercise of discretion in choosing whether to grant leniency and impose the lesser penalty of 25 years to life for 16- or 17-year-old special circumstance murderers.' "], quoting *Guinn*, *supra*, 28 Cal.App.4th at pp. 1145, 1149.) But *Guinn* did not simply hold that sentencing courts have discretion. It concluded that section 190.5(b) expresses a "preference" for the imposition of life without parole; in other words, such a sentence is the "generally mandatory" punishment for juveniles convicted of special circumstance murder and "*the court's discretion is concomitantly circumscribed to that extent*." (*Guinn*, *supra*, 28 Cal.App.4th at p. 1142, italics added.)

In this context, as in others, how a legal inquiry conceptualizes the default rule and burden of persuasion can be dispositive when a court is authorized to make an all-things-considered judgment. In the context of California's Three Strikes law, for example, we have held that a court's discretionary power to strike prior felony convictions "in furtherance of justice" (§ 1385) is "carefully

circumscribe[d]" by a preference in the Three Strikes law against striking prior convictions. (*People v. Carmony* (2004) 33 Cal.4th 367, 378.) Because of this presumption, we have said that trial courts' decisions to strike a prior conviction should be " 'extraordinary.' " (*Ibid.*) Similarly here, it is one thing to say that a court, confronting two permissible sentencing options, may impose the harsher sentence if it finds that sentence justified by the circumstances. It is quite another to say that a court, bound by a presumption in favor of the harsher sentence, must impose that sentence unless it finds good reasons not to do so. When the choice between two sentences must be made by weighing intangible factors, a presumption in favor of one sentence can be decisive in many cases.

In *Graham*, the high court construed the Eighth Amendment to prohibit a sentence of life without parole for juvenile nonhomicide offenders because " '[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive' a sentence of life without parole for a nonhomicide crime 'despite insufficient culpability.' " (*Graham*, *supra*, 560 U.S. at p. 78, quoting *Roper*, *supra*, 543 U.S. at pp. 572–573.) To address the same risk in homicide cases, *Miller* requires sentencing courts to undertake a careful individualized inquiry before imposing life without parole on juvenile homicide offenders. (*Miller*, *supra*, 567 U.S. at pp. __, __ [132 S.Ct. at pp. 2468, 2469.) Given *Miller*'s conception of a proper individualized sentencing inquiry, a serious constitutional concern would arise if we were to interpret section 190.5(b) as a rule that "circumscribe[s]" the court's discretion by presuming "[i]n the first instance" that life without parole is the appropriate sentence for special circumstance murder committed by a 16- or 17-year-old juvenile. (*Guinn*, *supra*, 28 Cal.App.4th at p. 1142.)

Third, the Attorney General claims that California's sentencing scheme already "makes LWOP terms for minors uncommon in fact" notwithstanding the

33

*Guinn* presumption. In support of this claim, she relies on the following passage from a footnote in *Miller*: "Where mandatory sentencing does not itself account for the number of juveniles serving life-without-parole terms, the evidence we have of practice supports our holding. Fifteen jurisdictions make life without parole discretionary for juveniles. See Alabama Brief 25 (listing 12 States); Cal. Penal Code Ann. § 190.5(b) (West 2008); Ind. Code § 35-50-2-3(b) (2011); N.M. Stat. §§ 31-18-13(B), 31-18-14, 31-18-15.2 (2010). According to available data, only about 15% of all juvenile life-without-parole sentences come from those 15 jurisdictions, while 85% come from the 29 mandatory ones. [Citations.] That figure indicates that when given the choice, sentencers impose life without parole on children relatively rarely." (*Miller*, *supra*, 567 U.S. at p. __, fn. 10 [132 S.Ct. at p. 2472, fn. 10], citing Human Rights Watch, State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP) (2009) <http://www.hrw.org/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole> [as of May 5, 2014] (Human Rights Watch JLWOP Rep.).)

As an initial matter, this passage in *Miller*, while considering the 15 nonmandatory sentencing jurisdictions in the aggregate, said nothing specific about California. In order to reliably determine whether the discretion afforded by section 190.5(b) has resulted only rarely in juvenile life without parole sentences, one would need to know not only the number of such sentences meted out in California but also the number of cases in which life without parole was considered and, in the exercise of the court's discretion, rejected.

To the extent they prove anything, the statistics from *Miller* support *defendants'* point that a statutory presumption in favor of life without parole significantly increases the likelihood that such a sentence will be imposed. It is true that the 15 states with nonmandatory sentencing laws, including California,

34

accounted for 15% or a total of 376 of the 2,589 juveniles in the United States serving life without parole sentences in 2009. (*Miller*, *supra*, 567 U.S. at p. __, fn. 10 [132 S.Ct. at p. 2472, fn. 10], citing Human Rights Watch JLWOP Rep.) But California — apparently the only jurisdiction whose discretionary sentencing law incorporates a presumption in favor of life without parole — accounted for over 70% or a total of 265 of the 376 life without parole sentences in those 15 states (see Human Rights Watch JLWOP Rep.), even though California accounted for only 43% of the combined juvenile population of those 15 states in 2009 (see U.S. Dept. of Justice, Off. of Juvenile Justice and Delinquency Prevention, Easy Access to Juvenile Populations: 1990–2012 <http://www.ojjdp.gov/ojstatbb/ ezapop/> [as of May 5, 2014] (OJJDP Juvenile Populations)). Thus, the vast majority of discretionary life without parole sentences imposed on juveniles are imposed in California, even though the juvenile population in the 14 other discretionary sentencing states taken together is much larger than the juvenile population in California. These data suggest that a statutory presumption in favor of life without parole makes a significant practical difference.

The Attorney General finds it significant that "California (with close to fifteen percent of the nation's population) plus fourteen other states produced just fifteen percent of all juveniles sentenced to LWOP terms." But in 2009, California's 265 juvenile offenders serving life without parole accounted for 10.4% of all such juvenile offenders in the 44 states that authorize the sentence (see Human Rights Watch JLWOP Report), which is roughly comparable to California's 13.3% share of the total juvenile population in those 44 states in 2009 (see OJJDP Juvenile Populations). By contrast, the 14 other discretionary sentencing states taken together had 17.8% of the total juvenile population in those 44 states (see *ibid.*) and a mere 4.4% of all juvenile offenders serving life without parole (see Human Rights Watch JLWOP Rep.). In sum, the Attorney General's

35

reliance on the data cited in *Miller* does not enable us to confidently conclude that the discretion afforded by section 190.5(b), when constrained by a presumption in favor of life without parole, has resulted in imposition of life without parole only on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].)

Finally, the Attorney General argues that the recent enactment of Penal Code, section 1170, subdivision (d)(2) (hereafter section 1170(d)(2)) eliminates any constitutional problems arising from the *Guinn* presumption. This statute provides: "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing." (§ 1170, subd. (d)(2)(A)(i).) The petition must include, among other things, a "statement describing his or her remorse and work towards rehabilitation." (§ 1170, subd. (d)(2)(B).) "If the court finds by a preponderance of the evidence that the statements in the petition are true, the court shall hold a hearing to consider whether to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170, subd. (d)(2)(E).)

"The factors that the court may consider when determining whether to recall and resentence include, but are not limited to, the following: [¶] (i) The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law. [¶] (ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall. [¶] (iii) The defendant committed the offense with at least

36

one adult codefendant.  [¶]  (iv) Prior to the offense for which the sentence is being considered for recall, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress.  [¶]  (v) The defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense.  [¶]  (vi) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse.  [¶] (vii) The defendant has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved with crime.  [¶] (viii) The defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor."  (§ 1170, subd. (d)(2)(F).)

If the court declines to recall the defendant's sentence, the defendant may try again after having served 20 years.  (§ 1170, subd. (d)(2)(H).)  If again unsuccessful, the defendant may file a third and final petition after having served 24 years.  (*Ibid.*)

As an initial matter, section 1170(d)(2) has no bearing on Moffett's case. Because the victim of Moffett's homicide offense was "a public safety official," Moffett is ineligible for resentencing under section 1170(d)(2).  (§ 1170, subd. (d)(2)(A)(ii).)  But even for juvenile offenders such as Gutierrez, the potential for relief under section 1170(d)(2) does not eliminate the serious constitutional doubts arising from a presumption in favor of life without parole under section 190.5(b) because the same questionable presumption would apply at

37

resentencing. The statute makes clear that if the sentencing court grants an inmate's petition for a resentencing hearing, the hearing must be conducted "in the same manner as if the defendant had not previously been sentenced." (§ 1170, subd. (d)(2)(G).) Thus, if section 190.5(b) establishes a presumption in favor of life without parole, a court acting pursuant to section 1170, subdivision (d)(2)(G) would be required to apply the same presumption in evaluating the circumstances at resentencing (only this time, unlike at the initial sentencing, the defendant would have no guarantee of counsel).

Nor does the fact that section 1170(d)(2) provides a potential mechanism for resentencing after 15 to 24 years mean that the initial sentence "is thus no longer effectively a sentence of life without the possibility of parole," as the Attorney General's briefing contends. A sentence of life without parole under section 190.5(b) remains *fully effective* after the enactment of section 1170(d)(2). That is why section 1170(d)(2) sets forth a scheme for *recalling* the sentence and *resentencing* the defendant. As the Attorney General notes, section 1170(d)(2) provides juvenile offenders convicted of special circumstance murder with "three opportunities to have their sentences of life without the possibility of parole *changed* to a sentence of 25 years to life." (Italics added.)

The Attorney General contends that section 1170(d)(2) removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release. In support of this contention, the Attorney General relies on a "cf." citation in *Miller* to language in *Graham*. (See *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469] ["Cf. *Graham*, 560 U.S., at __, 130 S.Ct., at 2030 ('A State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation')."]; see also *Graham*, *supra*, 560 U.S. at p. 75 ["It is for the State,

in the first instance, to explore the means and mechanisms for compliance."].) However, *Graham* spoke of providing juvenile offenders with a "meaningful opportunity to obtain release" as a constitutionally required alternative to — not as an after-the-fact corrective for — "*making the judgment at the outset* that those offenders never will be fit to reenter society." (*Graham*, at p. 75, italics added.) Likewise, *Miller*'s "cf." citation to the "meaningful opportunity" language in *Graham* occurred in the context of prohibiting "imposition of that harshest prison sentence" on juveniles under a mandatory scheme. (*Miller*, at p. __ [132 S.Ct. at p. 2469].) Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility "at the outset." (*Graham*, at p. 75.)

Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance: "Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset*." (*Graham*, *supra*, 560 U.S. at p. 73, italics added.) By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to section 1170(d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous. Consistent with *Graham*, *Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole "*before* imposing a particular penalty." (*Miller*,

*supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2471], italics added; see *id.* at pp. __, __ [132 S.Ct. at pp. 2469, 2475].)

In sum, construing section 190.5(b) to establish a presumption in favor of life without parole raises serious constitutional concerns under the reasoning of *Miller* and the body of precedent on which *Miller* relied. The recent enactment of section 1170(d)(2) does not eliminate those concerns. Because section 190.5(b) is reasonably susceptible to two interpretations, we will adopt the construction that renders it "free from doubt as to its constitutionality." (*Conservatorship of Wendland*, *supra*, 26 Cal.4th at p. 548.) We hold that section 190.5(b) confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole. In light of this holding, we disapprove *People v. Guinn*, *supra*, 28 Cal.App.4th 1130, and its progeny.

## C.

Defendants contend that even when section 190.5(b) is not construed to establish a presumption in favor of life without parole, the imposition of life without parole is unconstitutional because the statute does not allow the sentencing court to consider the distinctive attributes of youth discussed by the high court in *Miller.* We disagree. Section 190.5(b) authorizes and indeed requires consideration of the *Miller* factors.

Under section 190.5(b), a sentencing court must consider the aggravating and mitigating factors enumerated in Penal Code section 190.3 and the California Rules of Court. (See *Ybarra*, *supra*, 166 Cal.App.4th at pp. 1089–1093.) Section 190.5(b) does not expressly direct the sentencing court to consider those factors, but "since all discretionary authority is contextual, those factors that direct similar sentencing decisions are relevant, including 'the nature and circumstances of the

offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978.)

The factors that a sentencing court must consider under section 190.3 include "[t]he age of the defendant at the time of the crime." (Pen. Code, § 190.3, factor (i).) We have said that this factor permits the court to consider not simply a defendant's age but also "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People v. Lucky* (1988) 45 Cal.3d 259, 302 (*Lucky*).) *Lucky* did not involve a juvenile offender, but as relevant here, *Lucky* confirms that section 190.3, subdivision (i) provides a basis for the court to consider that " 'youth is more than a chronological fact' " and to take into account any mitigating relevance of "age and the wealth of characteristics and circumstances attendant to it," as *Miller* requires. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467].)

*Miller* discussed a range of factors relevant to a sentencer's determination of whether a particular defendant is a " 'rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) As noted at oral argument by counsel for amicus curiae Juvenile Law Center, the high court in *Miller* provided a "recap" of those factors, grouping them into five categories. (*Id.* at p. __ [132 S.Ct. at p. 2468]; see *ante*, at p. 26.) We understand *Miller* to require a sentencing court to admit and consider relevant evidence of the following:

First, a court must consider a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468]; see, e.g., *ibid.* ["To be sure, Jackson learned on the way to the video store that his friend Shields was carrying a gun, but his age could well have

41

affected his calculation of the risk that posed, as well as his willingness to walk away at that point."].) *Miller* observed that " 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' " and that "those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' " (*Id.* at pp. __–__ [132 S.Ct. at pp. 2464–2465]; see *Roper*, *supra*, 543 U.S. at p. 573 ["It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."].) *Miller* further noted that "the science and social science supporting [these] conclusions have become even stronger" in recent years. (*Miller*, at p. __, fn. 5 [132 S.Ct. at p. 2464, fn. 5].)

Second, a sentencing court must consider any evidence or other information in the record regarding "the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468].) Relevant "environmental vulnerabilities" include evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance. (*Id.* at pp. __, __, __–__ [132 S.Ct. at pp. 2465, 2467, 2468–2469].)

Third, a court must consider any evidence or other information in the record regarding "the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him." (*Miller*, *supra*, 567 U.S. at p. __ [132

42

S.Ct. at p. 2468]; see *ibid.* [" 'a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability' "].) Also relevant is whether substance abuse played a role in the juvenile offender's commission of the crime. (*Id.* at p. __ [132 S.Ct. at p. 2469].)

Fourth, a court must consider any evidence or other information in the record as to whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, *e.g.*, *Graham*, 560 U.S. at —, 130 S.Ct., at 2032 ('[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings'); *J.D.B. v. North Carolina*, 564 U.S. —, —, 131 S.Ct. 2394, 2400–2401 (2011) (discussing children's responses to interrogation). " (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468].)

Finally, a sentencing court must consider any evidence or other information in the record bearing on "the possibility of rehabilitation." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468]; see *id.* at p. __ [132 S.Ct. at p. 2464] ["[A] child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' "].) The extent or absence of "past criminal history" is relevant here. (*Id.* at p. __ [132 S.Ct. at p. 2469].)

Although courts elsewhere have enumerated or categorized these factors in different ways, we note that the emerging body of post-*Miller* case law has uniformly held that a sentencing court must consider the factors discussed above before imposing life without parole on a juvenile homicide offender. (See *State v. Henderson* (Ala. 2013) __ So.3d __, __ [2013 WL 4873077, at p. *21]; *State v. Null* (Iowa 2013) 836 N.W.2d 41, 74; *Parker v. State* (Miss. 2013) 119 So.3d 987,

43

995–996, 998 & fn. 18; *State v. Hart* (Mo. 2013) 404 S.W.3d 232, 241; *Commonwealth v. Batts* (Pa. 2013) 66 A.3d 286, 297; *Bear Cloud v. State* (Wyo. 2013) 294 P.3d 36, 47; *People v. Carp* (Mich.Ct.App. 2012) 828 N.W.2d 685, 720; *Daugherty v. State* (Fla.Dist.Ct.App. 2012) 96 So.3d 1076, 1079; *State v. Fletcher* (La.Ct.App. 2013) 112 So.3d 1031, 1036–1037; see also *Williams v. Virgin Islands* (V.I. 2013) __ V.I. __, __ [2013 WL 5913305 at p. *8]; cf. *Conley v. State* (Ind. 2012) 972 N.E.2d 864, 875 [upholding a discretionary life without parole sentence with detailed findings].)  This approach complements our recent holding in *Caballero* that a trial court must consider many of the same factors when imposing a sentence on a juvenile nonhomicide offender.  (See *Caballero*, *supra*, 55 Cal.4th at pp. 268–269.)

In sum, we hold that the trial court must consider all relevant evidence bearing on the "distinctive attributes of youth" discussed in *Miller* and how those attributes "diminish the penological justifications for imposing the harshest sentences on juvenile offenders."  (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].)  To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance.  But *Miller* "require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Id.* at p. __ [132 S.Ct. at p. 2469].)

44

## III.

We now determine the proper disposition of these cases in light of the principles above.  In each case, the record indicates that the trial court understood it had a degree of discretion in sentencing the defendant.  However, both courts imposed life without parole at a time when *Guinn* was the prevailing authority. In Moffett's case, the trial court expressly acknowledged *Guinn*'s holding when it framed the pertinent question as whether it should "deviate from the statutory requirement of life without the possibility of parole and sentence Mr. Moffett to a determinate term of 25 years to life."  In Gutierrez's case, the trial court did not explicitly refer to a presumption in favor of life without parole.  But, as the Attorney General notes in her briefing, the "presumption . . . had previously been undisturbed for over 20 years."  Absent evidence to the contrary, we presume that the trial court knew and applied the governing law.  (See *People v. Thomas* (2011) 52 Cal.4th 336, 361.)  To be clear, we do not fault the trial courts in these cases; they dutifully applied the law as it stood at the time. But we conclude that neither court made its sentencing decision with awareness of the full scope of discretion conferred by section 190.5(b) or with the guidance set forth in *Miller* and this opinion for the proper exercise of its discretion.

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court.  (See *United States v. Tucker* (1972) 404 U.S. 443, 447 [30 L.Ed.2d 592, 596, 92S.Ct. 589]; *Townsend v. Burke* (1948) 334 U.S. 736, 741 [92 L.Ed. 1690, 1693, 68 S.Ct. 1252].)  A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record."  (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)  In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record

45

"clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." (*Ibid.*; see *People v. Rodriguez* (1998) 17 Cal.4th 253, 257; *Romero*, *supra*, 13 Cal.4th at p. 530, fn. 13.) Although the trial courts in these cases understood that they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of life without parole, we cannot say with confidence what sentence they would have imposed absent the presumption. Accordingly, we remand both cases for resentencing.

## CONCLUSION

Juveniles who commit crimes that reflect impetuosity, irresponsibility, inability to assess risks and consequences, vulnerability to peer pressure, substance abuse, or pathologies traceable to an unstable childhood cannot and should not escape punishment. And when the crime is "a vicious murder," it is "beyond question" that a juvenile offender "deserve[s] severe punishment." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) Because Moffett and Gutierrez have been convicted of special circumstance murder, each will receive a life sentence. (§ 190.5(b).) The question is whether each can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the "diminished culpability and greater prospects for reform" that ordinarily distinguish juveniles from adults. (*Miller*, at p. __ [132 S.Ct. at p. 2464].) Because the trial courts here decided that question without proper guidance on the sentencing discretion conferred by section 190.5(b) and the

46

considerations that must inform the exercise of that discretion, we remand both cases for proceedings not inconsistent with this opinion.

LIU, J.

WE CONCUR: CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
KENNARD, J.*

---

\* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY CORRIGAN, J.**

I agree with the majority's conclusion that Penal Code section 190.5, subdivision (b) (section 190.5(b)) imposes no presumption in favor of life without parole. So construed, the statute fully satisfies current federal constitutional concerns. I write separately to stress that California's individualized, discretionary sentencing scheme is very different from the mandatory life without parole sentence the United States Supreme Court addressed in *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*).

Discretionary decisions occur at multiple steps in our state's process. First, the prosecutor exercises discretion in charging a minor as an adult. Next, unless the crime is one for which trial in criminal court is prescribed (see Welf. & Inst. Code, § 602, subd. (b)),[1] the court determines whether the minor is unfit to be tried in juvenile court. Finally, if a minor is tried and convicted as an adult, the court makes an individualized determination about the appropriate sentence in light of all the evidence presented.

In *Miller*, the Supreme Court commented that judicial discretion regarding a minor's transfer to adult court is of "limited utility" if the court receives only

---

[1]     Trial as an adult is automatic for special circumstance murder *only* if the prosecutor alleges the minor personally killed the victim. (Welf. & Inst. Code, § 602, subd. (b)(1).)

1

partial information about the minor and circumstances of the offense. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2474].) California's transfer process entails a substantial inquiry, however. When a motion for transfer is made, the court is required to order an investigation and written report on the minor's behavioral patterns and social history. (Welf. & Inst. Code, § 707, subd. (c).) The court must also consider "any other relevant evidence" the minor wishes to submit. (*Ibid.*) Although there is a presumption of unfitness for extremely violent felonies such as murder, it is overcome if the court finds the minor amenable to juvenile court treatment based on an evaluation of (1) the degree of criminal sophistication the minor exhibits, (2) the possibility of rehabilitation, (3) the minor's history of delinquency, (4) the success of previous attempts at rehabilitation, and (5) the circumstances and gravity of the alleged offense. (*Ibid.*)

*Miller* also criticized transfer-stage discretion as a poor substitute for discretion at posttrial sentencing. (See *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at pp. 2474-2475].) But in California the discretion available to a juvenile court in the transfer process is not a substitute for, but a *supplement* to, the robust discretion exercised at sentencing. *Miller* was addressing states in which the *only* discretionary review of a minor's background and offense occurs at a pretrial fitness hearing. In those states, once a decision has been made to try a minor as an adult, a life-without-parole sentence is *mandatory* if the minor is found guilty of the charged offense. (See *Miller*, at p. __ [132 S.Ct. at p. 2474].) Evidence presented at the transfer hearing cannot be offered in mitigation at sentencing. (*Ibid.*) The situation is quite different in California. Courts in our state must consider all relevant circumstances in determining the appropriate sentence for a minor. When a minor between the ages of 16 and 18 is convicted of special circumstance murder, the court has discretion to impose a sentence of 25 years to life imprisonment or life without possibility of parole. (§ 190.5(b).) The harsher sentence is not available for *any* defendant who was under age 16 when the crime was committed. (*Ibid.*) This reality again sets California quite apart from the

2

states mentioned in *Miller* that expose minors to life without parole at "any age— be it 17 or 14 or 10 or 6." (*Miller*, at p. __ [132 S.Ct. at p. 2473 & fn. 14].) Even for older teenagers, no mandatory sentence is ever required in California.

Accordingly, while I agree that the concerns expressed in *Miller* are important, careful attention should be given to how a defendant's age and maturity actually factor into each case when the court exercises its discretion under section 190.5(b). The special attributes of youth mentioned in *Miller* may well be present in the case of some minors. There will be other minors, however, who have grown beyond them. It is because each case is different, and should be treated accordingly, that we repose confidence in the discretion of the court to impose a sentence that is appropriate in light of *all* relevant circumstances. Whether "appropriate occasions" for sentencing juveniles to life without parole will be uncommon is not a prognostication that should be made globally and in the abstract. (See maj. opn. *ante*, at pp. 27, 28, quoting *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) The *Miller* majority made this comment in the context of two 14-year-olds, one of whom had a delinquency history comprised of no more than truancy and one instance of " 'second-degree criminal mischief.' " (*Miller*, at p. __ [132 S.Ct. at p. 2469].) As noted, the court was also addressing very different state statutes, which imposed *mandatory* lifetime sentences on much younger children whose individual circumstances were never considered except at a limited pretrial fitness hearing.

The appropriate sentence for any *particular* minor remains a question for the sentencing court. As the *Miller* majority itself observed: "Our decision does not categorically bar a penalty for a class of offenders or type of crime . . . . Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2471].) We make clear today that this process is fully embraced in California. The majority opinion here should not be read to suggest otherwise.

3

CORRIGAN, J.

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**

4

**CONCURRING OPINION BY LIU, J.**

In light of *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*), the court today holds that Penal Code "section 190.5(b) confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole." (Maj. opn., *ante*, at p. 40.) We also hold that "[s]ection 190.5(b) authorizes and indeed requires consideration of the *Miller* factors." (*Ibid.*) Justice Corrigan's concurring opinion does not disagree with either proposition.

Justice Corrigan observes that our trial courts have discretion to decide whether trial as an adult is appropriate in cases where a juvenile is charged with murder but not charged with personally killing the victim. (Conc. opn., *ante*, at pp. 1–2 & fn. 1.) I agree that our trial courts have such discretion, but I would note *Miller*'s admonition that "transfer-stage discretion . . . has limited utility" because "the judge often does not know then what she will learn, about the offender or the offense, over the course of the proceedings." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2474].) Further, "and still more important," *Miller* said, "the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions

1

often present a choice between extremes:  light punishment as a child or standard sentencing as an adult (here, life without parole)."  (*Ibid.*; see Welf. & Inst. Code, § 607 [minor must be discharged from juvenile court's jurisdiction at age 21 in most cases and at age 25 in any case, unless civilly committed].)  "Discretionary sentencing in adult court would provide different options:  There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years.  It is easy to imagine a judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate."  (*Miller*, at pp. __–__ [132 S.Ct. at pp. 2474–2475].)  This, too, informed *Miller*'s judgment that "transfer-stage discretion . . . has limited utility."  (*Id.* at p. __ [132 S.Ct. at p. 2474].)

Finally, although Justice Corrigan is correct that *Miller* involved two 14-year-olds (conc. opn., *ante*, at p. 3), lower courts should take note that *Miller*, in clear language, announced a principle that applies to all juveniles, not just 14-year-olds:  "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' "  (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].)

LIU, J.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gutierrez and People v. Moffett
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 209 Cal.App.4th 646 and 209 Cal.App.4th 1465
**Rehearing Granted**
_____

**Opinion No.** S206365 and S206771
**Date Filed:** May 5, 2014
_____

**Court:** Superior
**County:** Ventura and Contra Costa
**Judge:** Patricia M. Murphy and Laurel S. Brady
_____

**Counsel:**

Jean Matulis, under appointment by the Supreme Court, for Defendant and Appellant Luis Angel Gutierrez.

Joseph Shipp, under appointment by the Supreme Court, for Defendant and Appellant Andrew Lawrence Moffett.

L. Richard Braucher; and Susan L. Burrell for Pacific Juvenile Defender Center and Youth Law Center as Amici Curiae on behalf of Defendant and Appellant Luis Angel Gutierrez.

Latham & Watkins, Aaron Murphy and Anthony J. Bruno for United Mexican States as Amicus Curiae on behalf of Defendant and Appellant Luis Angel Gutierrez.

Elizabeth M. Calvin; DLA Piper and Steven S. Kimball for Human Rights Watch as Amicus Curiae on behalf of Defendant and Appellant Luis Angel Gutierrez.

International Human Rights Clinic, Elizabeth A. Henneke; Frank C. Newman International Human Rights Law Clinic, Constance de la Vega and Lani Virostko for Amnesty International, Disability Rights Legal Center, Human Rights Advocates, Loyola Law School Center for Juvenile Law and Policy and University of San Francisco Center for Law and Global Justice as Amici Curiae on behalf of Defendants and Appellants.

Jessica R. Feierman and Marsha L. Levick for Juvenile Law Center as Amicus Curiae on behalf of Defendants and Appellants.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent in S206365.

**Counsel:**

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Lawrence M. Daniels, René A. Chacón and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent in S206771.

Criminal Justice Legal Foundation and Kent S. Scheidegger for Jo Ann Lasater, Phyllis Loya and James Lasater as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jean Matulis
Post Office Box 1237
Cambria, CA 93428
(805) 927-1990

Joseph Shipp
Post Office Box 20347
Oakland, CA 94620
(510) 530-9043

Marsha L. Levick
Juvenile Law Center
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
(215) 625-0551

David F. Glassman
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2355

David M. Baskind
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-1308