Filed 1/12/15 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ARTURO HERNANDEZ,<br><br>    Defendant and Appellant. | C067260<br><br>(Super. Ct. No. SF113661D)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING<br><br>(CHANGE IN JUDGMENT) |

    APPEAL from a judgment of the Superior Court of San Joaquin County, Bernard Garber, Judge.  Reversed.

    John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

    Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Darren K. Indermill, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

1

THE COURT:

The opinion of this court filed on December 11, 2014, in the above entitled case is modified as follows:

On page 2, in the second line of the first paragraph, delete "61" and insert "an effective term of 68" in its place.

On pages 2 and 3, delete the first sentence of the paragraph that begins "The trial court sentenced" and insert the following in its place: The trial court sentenced defendant to an effective term of 68 years to life in prison, constituted as follows: a term of 15 years to life for shooting at an inhabited dwelling; a consecutive life term for one of the attempted murders (which requires service of no less than seven years in prison before parole (Pen. Code, § 3046, subd. (a)); a consecutive term of 25 years to life for the firearm enhancement on that attempted murder; a consecutive term of three years and four months for one of the assaults; a consecutive term of 15 years to life for the other attempted murder; and a consecutive term of two years and eight months for one of the other assaults.

On page 3, delete the sentence in footnote 2 and insert the following in its place: The court stayed the sentences for being an accessory to a felony and for the third assault pursuant to Penal Code section 654.

On page 14, delete the second paragraph in footnote 11.

On page 15, in the seventh line of the paragraph in the footnote, delete "61" and insert "68" in its place.

On page 15, in the ninth line of the paragraph in the footnote, delete "77" and insert "84" in its place.

On page 15, in the 10th line of the paragraph in the footnote, delete the parenthetical phrase "(even though it was based on a calculation error)."

On page 22, at the end of the paragraph immediately preceding the heading "DISPOSITION," insert a new footnote (12) containing the following text:  In a petition for rehearing, the People argue for the first time that the trial court erred by calculating the determinate terms for the two assault convictions the court imposed consecutively as subordinate terms.  The People request that we "address this issue to provide guidance to the trial court on remand."  We decline to do so, as the People have presented this argument both belatedly -- in a petition for rehearing -- and inadequately -- in a footnote.  The People may raise this issue on remand, however, in connection with defendant's resentencing.

The petition for rehearing is denied.  This modification affects the judgment.

BY THE COURT:

    ROBIE               , J.

    HOCH               , J.

3

Filed 12/11/14 (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C067260 |
| Plaintiff and Respondent, | (Super. Ct. No. SF113661D) |
| v. | |
| JOSE ARTURO HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Bernard Garber, Judge. Reversed.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Darren K. Indermill, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

1

Defendant Jose Arturo Hernandez was convicted of two counts of attempted murder and five other charges and sentenced to 61 years to life in prison for crimes he committed when he was 16 years old.[1] On appeal, he contends his trial attorney was ineffective because: (1) his attorney did not move to suppress his confession; and (2) his attorney did not object to his sentence as violating the constitutional proscription against cruel and unusual punishment.

We find no ineffective assistance in counsel's failure to move to suppress the confession because such a motion would have had no merit. We do conclude, however, that under recent decisions from the United States and California Supreme Courts, defendant's sentence is unconstitutional. Accordingly, we reverse and remand for resentencing consistent with those decisions.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant's arguments on appeal do not require a detailed recitation of the evidence or of the trial. Suffice it to say that on December 16, 2009, defendant participated in three different gang-related shootings. A week later, defendant was arrested and interrogated by Tracy Police Detective Matthew Sierra. During the interrogation, defendant admitted being involved in the shootings.

A jury found defendant guilty of two counts of attempted murder, one count of being an accessory to a felony, three counts of assault with a firearm, and one count of shooting at an inhabited dwelling. The jury also found true a number of firearm and gang enhancement allegations.

The trial court sentenced defendant to an indeterminate term of 55 years to life in prison -- 15 years to life for shooting at an inhabited dwelling, 25 years to life for one of

---

[1] Defendant was born in October 1993; the crimes of which he was convicted occurred in December 2009.

2

the attempted murders, and 15 years to life for the other attempted murder -- and to a consecutive determinate term of six years in prison -- three years and four months for one of the assaults and two years and eight months for one of the other assaults -- for an aggregate term of 61 years to life.[2] The court granted defendant 451 days of presentence credits. Defendant timely appealed.

DISCUSSION

I

*Defendant's Trial Attorney Was Not Ineffective In*

*Failing To Move To Suppress Defendant's Confession*

Defendant contends his confession to police was involuntary, but he acknowledges that he cannot raise this issue directly on appeal because his trial attorney did not move to suppress his confession. Accordingly, he contends his trial attorney was constitutionally ineffective for not making such a motion. To prevail on this argument, defendant must show that the motion to suppress he contends his trial attorney should have made would have had merit. (See *People v. Wharton* (1991) 53 Cal.3d 522, 576.) Defendant has not made this showing.

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*,[3] required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 947, quoting *Miranda v.*

---

**2**     The court ordered the sentences for being an accessory to a felony and for the third assault to run concurrently to defendant's other sentences.

**3**     *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

*Arizona*, *supra*, 384 U.S. at p. 479 [16 L.Ed.2d at p. 726].) " 'Critically, however, a suspect can waive these rights.' [Citation.] To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.)

While the foregoing constitutional protections apply to minors, the United States Supreme Court has " 'emphasized that admissions and confessions of juveniles require special caution' [citation] and that courts must use 'special care in scrutinizing the record' to determine whether a minor's custodial confession is voluntary." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1166-1167.) In making this determination, "we inquire 'into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.' Because defendant is a minor, the required inquiry 'includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*Lessie*, at p. 1169.)

In arguing that his confession was involuntary, defendant tries to analogize his case to a case from the Ninth Circuit -- *Doody v. Ryan* (9th Cir. 2011) 649 F.3d 986 (*Doody*) -- in which a majority of that court concluded that a minor's confession was involuntary.[4] As will be seen, the situation in *Doody* is easily distinguishable from the

---

[4] In defendant's opening brief, filed in August 2011, defendant's appointed appellate attorney actually discussed an earlier opinion in the *Doody* case -- *Doody v. Schriro* (9th Cir. 2010) 596 F.3d 620 -- that had been vacated almost a year earlier, in October 2010, when the United States Supreme Court granted certiorari, vacated the judgment, and remanded the case to the Ninth Circuit for further consideration. (*Ryan v. Doody* (2010) ___ U.S. ___ [178 L.Ed.2d 282].) The *Doody* opinion that we discuss herein was filed in May 2011, following the Ninth Circuit's further consideration of the case in response to the Supreme Court's directions. (*Doody*, *supra*, 649 F.3d at p. 990.)

4

situation in this case, and the Ninth Circuit's decision in that case does not compel the same result here.

In *Doody*, the Ninth Circuit majority concluded that a confession by a 17-year-old high school student should have been excluded because "the relentless, nearly thirteen-hour interrogation of a sleep-deprived juvenile by a tag team of detectives" rendered his confession involuntary. (*Doody*, *supra*, 649 F.3d at pp. 990, 1023.) In reaching this conclusion, the Ninth Circuit majority relied on a number of facts. First, the police interrogation of the defendant "began at 9:25 p.m. and concluded at 10:00 a.m. the next day." (*Id.* at p. 991.) The majority characterized this as "an extraordinarily lengthy interrogation of a sleep-deprived and unresponsive juvenile." (*Id.* at p. 1009.)

Second, the police detective's "recitation of *Miranda*'s basic warnings consume[d] twelve pages of transcript, largely a byproduct of the detective's continuous usage of qualifying language." (*Doody*, *supra*, 649 F.3d at p. 991.) This "twelve-page exposition . . . negated the intended effect of the *Miranda* warning[s]" because the detective "downplayed the warnings' significance, deviated from an accurate reading of the *Miranda* waiver form, and expressly misinformed Doody regarding his right to counsel" by implying "that Doody only had the right to counsel if he were involved in a crime." (*Doody*, at pp. 991, 1003.)

Third, "the detectives' relentless and uninterrupted interrogation of an unresponsive juvenile was far from 'courteous.' Instead, the detectives continuously demanded, over and over without a response from Doody, answers to their questions. . . . Although the detectives sometimes couched their questions in 'pleading' language, their

---

As defendant's appellate attorney points out in the reply brief, the Ninth Circuit's opinion following further consideration applies the same analysis as did the court's original opinion and "essentially duplicate[s] the language of the original opinion." Nonetheless, we are mystified as to why defendant's attorney was unable to find and discuss the citable opinion that was filed three months before he filed the opening brief instead of discussing a superseded opinion that was vacated almost a year earlier.

tones were far from pleasant, varying from 'pleading' to scolding to sarcastic to demeaning to demanding.  Regardless of tone, over twelve hours of insistent questioning of a juvenile by tag teams of two, three and four detectives became menacing and coercive rather than 'courteous.'  Tellingly, some of the detectives' statements, particularly those immediately preceding the confession, informed Doody that he *had* to answer their questions. . . .  Indeed, at times the tones of the detectives [we]re downright chilling."  (*Doody*, *supra*, 649 F.3d at p. 1013.)

Fourth,"[t]he intensive and lengthy questioning was compounded by Doody's lack of prior involvement in the criminal justice system, his lack of familiarity with the concept of *Miranda* warnings, and the staging of his questioning in a straight-back chair, without even a table to lean on."  (*Doody*, *supra*, 649 F.3d at p. 1009.)

Fifth, "this same task force questioned four adult men and, undoubtedly using the same tactics, procured what the State concedes were false confessions from all four." (*Doody*, *supra*, 649 F.3d at p. 1013.)

Sixth, "[b]y the end of the interrogation, Doody was sobbing almost hysterically." (*Doody*, *supra*, 649 F.3d at p. 1014.)

Defendant contends that "[t]he factual basis for an involuntary finding in *Doody* are matched by the circumstances of the instant case."  We disagree.

A

*Use Of The Bathroom*

First, contrary to defendant's argument, we find nothing comparable between the nearly 13-hour interrogation in *Doody*, which lasted through the night and into the following morning, and the interrogation here, which lasted about two hours.  Defendant insists that even though the interrogation did not last nearly as long as in *Doody*, "[t]he stress of interrogation pressure" here was like that in *Doody* because Detective Sierra was "determin[ed] to force [him] to talk without a bathroom break, in spite of [his] statement at the outset that he needed to urinate."  In other words, defendant suggests his will was

6

overborne at least in part because he needed to urinate and Detective Sierra would not let him do so.

The record does not support defendant's argument in this regard. A review of the video recording of the interrogation establishes that defendant never showed any distress over not being allowed to use the bathroom. At the outset of the interrogation, Detective Sierra offered defendant more water, which defendant refused, saying first that "[i]f I drink more, man, I'm gonna have to pee," and then, "I'm already wanting to." After that, though, defendant did not press the point, and 40 transcript pages into the interview, he accepted the detective's offer of more water without saying anything about needing to use the bathroom. Shortly after that, defendant began to tell Detective Sierra about his involvement in the crimes. Again, however, he gave no indication that he was feeling pressured to talk because he needed to use the bathroom. Some 25 pages later, defendant refused the detective's offer of more water or a soda and said that he "just need[ed] to pee." By that time, however, defendant had already made most of his confession. Moreover, defendant still did not show any sign that he was talking to Detective Sierra because of his need to urinate. The detective showed defendant some photographs, and defendant identified various individuals in those photos. When the detective eventually told defendant he would let defendant go to the bathroom "in a second," defendant did not say anything about his need to go; instead, he told the detective, "Hey. Don't say, don't say nothing though," which Detective Sierra understood to be a request that he not tell any other gang member about what defendant was telling him. Later, defendant again declined the detective's offer of more water or a soda and said again that he "just need[ed] to pee." At that point, Detective Sierra left the interview room, and another

detective came in shortly thereafter and took defendant to the bathroom before the interrogation continued.**5**

Based on the foregoing, we find nothing to suggest that defendant's will was affected even in the slightest by his need to use the bathroom during the interrogation.

B

*Adequacy Of The Miranda Warnings*

Defendant next contends that the *Miranda* warnings he received were comparable to the faulty *Miranda* warnings that Doody received. Not so. As we have noted, in *Doody* the detective's *Miranda* warnings stretched over 12 pages of transcript due to his "continuous usage of qualifying language" which had the effect of "negat[ing] the intended effect of the . . . warning[s]" because the detective "downplayed the warnings' significance, deviated from an accurate reading of the *Miranda* waiver form, and expressly misinformed Doody regarding his right to counsel" by implying "that Doody only had the right to counsel if he were involved in a crime."**6** (*Doody*, *supra*, 649 F.3d at p. pp. 991, 1003.) Here, in contrast, Detective Sierra accurately stated the *Miranda* warnings in five lines of transcript. Nevertheless, defendant complains because the

---

**5** In constructing his argument on this point in defendant's opening brief, it appears that defendant's appellate counsel did not view the video recording of defendant's interrogation but instead tried to determine what had happened from the transcript alone. As a result, appellate counsel reached the erroneous conclusion that defendant "did not get his trip to the bathroom."

**6** Specifically, the detective told Doody, " 'Okay, and the next one states that you have the right to have an attorney present prior to and during questioning, and what that means [*sic*] that if you want one, you're allowed to have a lawyer here before and during you know my questions to you, okay. And then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we might think that you or somebody else is involved in, if you were involved in it, okay. Again, it [*sic*] not necessarily mean that you are involved, but if you were, then that's what that would apply to okay.' " (*Doody*, *supra*, 649 F.3d at p. 992.)

8

detective prefaced his simple statement of the *Miranda* warnings by telling defendant that he was "not under arrest or anything like that." According to defendant, by doing so, Detective Sierra "suggested [the warnings were] a mere formality that did not actually apply to [defendant] since he was not under arrest" and thus "implied [defendant] had no need for counsel." Defendant also contends that the detective's treatment of the warnings as a mere formality was accentuated by the fact that "interrogation began promptly after the warning[s] without asking if [defendant] wanted to waive his constitutional rights."

We find no support for defendant's argument that the form and context of the *Miranda* warnings he received supports his assertion that his confession was involuntary. In our view, there was nothing about Detective Sierra's prefatory statement that defendant was not under arrest that minimized or discounted the significance of the *Miranda* warnings that followed. Moreover, the warnings themselves were plainly and simply stated, and defendant expressly acknowledged that he understood them and that he had "heard [them] before." In fact, he asserted he had heard them "[l]ots of times," and he admitted that he had been arrested once before when he was "like, thirteen."[7] Thus, this case is nothing at all like *Doody*, where the *Miranda* warnings were "transform[ed] . . . into a twelve-page rambling commentary that [wa]s in alternating part misleading and unintelligible" and where the defendant "expressly [told] the detective that he had never heard of *Miranda* warnings." (*Doody*, *supra*, 649 F.3d at pp. 1004, 1007.)

---

**7** Even though defendant acknowledged only one prior arrest, it is possible he could have been given the *Miranda* warnings during other encounters with police that did not result in his arrest. He also could have been exposed to the warnings by various other means, for example, through film or television.

9

C

*Lies And Deception*

Defendant next tries to analogize this case to *Doody* by arguing that the interrogating detectives in each case used lies and deception. In particular, defendant complains that the detective interrogating him "concocted a bald-faced lie that if [defendant] confided in him no one else would ever know." In making this argument, however, while defendant accurately recounts what Detective Sierra said, he underplays the significance of all of the detective's words, as well as the context in which they were spoken. He also fails to acknowledge the import of his own words, which plainly suggest that Detective Sierra's statements did not actually mislead him into making a confession.

At one point in the interview, defendant expressed concern that if he talked to Detective Sierra about what happened, and if the detective then told other gang members about what defendant said ("if you go out talking shit, like, oh, this fool told me this and that"), "they" -- meaning the other gang members -- "could . . . kill" him. The detective assured defendant that he was not "talking to any other homeboys or anything like that." Later, Detective Sierra told defendant that being honest would help him out with a jury. This exchange then occurred:

"[Defendant]: If I talk, nobody's gonna know?

"Detective: It's gonna be between us, bro. It's between us right here.

"[Defendant]: Promise?

"Detective: I promise. It's with us right here. Okay? *I do have to write everything down, eventually,* because I gotta type, uh, for, like, ever. But just be honest, brother." (Italics added.)

At that point, defendant began answering Detective Sierra's questions. When the detective tried to cajole defendant into telling him "who shot," the following exchange occurred:

10

"[Defendant]:  Mm . . . Fuck, man . . . You know what can happen if I talk, if I go to jail?  Prison?  Do you know?  And they know everything.

"Detective:  They don't know sh--they don't know shit.

"[Defendant]:  They do.

"Detective:  You know what?

"[Defendant]:  You'd be surprised all the things they know, man.  Everybody [who] snitches, they get killed in prison, sooner or later.  They know, they know somehow.  They find out.  That's, that's, that's how bad those people are.  And you say you're not gonna say nothing.  Someone's gonna find out no matter what.  What I just said right now, is gonna get me killed sooner or later.  By my own people, man.  I know you're gonna tell someone else.  Fuck it.

"Detective:  Between us.  It's between us, bro.  *I mean, it's between us and it's between the courts, bro.*"  (Italics added.)

As Detective Sierra continued to emphasize the importance of telling the truth and continued to ask who shot, defendant focused on asking the detective what "they" -- presumably meaning the other gang members who were involved -- had told the detective.  When Detective Sierra implied that "[e]verybody" had said defendant had shot, defendant responded, "They all told you though?  That's fucked up, man, you think you got friends, man."  At that point, defendant admitted shooting.

From the foregoing, it is apparent that defendant never actually believed that what he was telling Detective Sierra would *only* be between the detective and him.  Defendant's primary concern was that the detective would tell other gang members about defendant's statements, and while Detective Sierra assured defendant he would not do so, he also made it clear to defendant that what defendant said *would* be made known to

11

other people -- in particular, the court and the jury.[8]  This was consistent with the *Miranda* warning defendant received at the outset of the interrogation, "Anything you say may be used against you in a court of law."  We find nothing in the interrogation to support the argument that defendant was actually misled into believing that what he told the detective would never be made known to anyone else.  Indeed, defendant himself seemed to be reconciled to the fact that his "own people" would find out what he said "no matter what," and yet he still talked.  Thus, nothing about the supposed "deception" used by the detective supports defendant's argument that his confession was involuntary.

D

*Promises And Threats*

Defendant next tries to analogize this case to *Doody* by arguing that the interrogating detectives in each case used promises of benefit and threats of harm.  Mostly, however, what defendant points to in this case are statements by the detective to the effect that it would go better for defendant in court if he was honest and told the truth about what happened.  But "there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials.  'No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence.'  [Citation.]  Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth."  (*People v. Williams* (2010) 49 Cal.4th 405, 444.)

---

[8]  Indeed, defendant testified at trial that he was forthcoming with Detective Sierra during the interrogation because he believed the detective's promise that "he wouldn't tell *any other gang members*" what defendant told him.  (Italics added.)

12

E

*Minimizing The Criminal Acts*

Finally, defendant tries to relate this case to *Doody* by arguing that in *Doody* the interrogating detectives demeaned Doody's accomplices while in this case the detective demeaned the rival gang members who were the victims of the shootings. According to defendant, in each case this tactic was used to "minimize" the criminal acts of which the defendant was accused.

How this supposed "minimization" of the criminal acts supports the conclusion that defendant's confession was involuntary is something defendant never makes clear. Certainly defendant does not point to anywhere in the *Doody* opinion where the Ninth Circuit majority relied on this aspect of the interrogation to support the conclusion that Doody's confession was involuntary. Without such analysis, defendant's reliance on this alleged similarity between the two cases (which is stretched, at best) does nothing to show that his confession was anything other than knowing, intelligent, and voluntary.

F

*Conclusion*

Weighing the totality of the circumstances surrounding defendant's confession, defendant has not persuaded us that a motion to suppress his confession as involuntary would have had any chance of success. Accordingly, his claim of ineffective assistance of counsel based on his trial attorney's failure to make such a motion is without merit.

13

## II

*Defendant's Sentence Constitutes Cruel And Unusual Punishment[9]*

In his opening brief, defendant contended his sentence constitutes cruel and unusual punishment under the Eighth Amendment and his trial attorney was ineffective for failing to object to the sentence on that ground.[10] Following the initial briefing in the case, both the United States Supreme Court and the California Supreme Court released opinions addressing the constitutionality of lengthy prison terms imposed on defendants for crimes committed as minors. (*Miller v. Alabama* (2012) ___ U.S. ___ [183 L.Ed.2d 407] (*Miller*); *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).) The parties filed supplemental briefs addressing those decisions, and in December 2012 the People conceded that "remand would be appropriate to resentence [defendant] so as to permit a meaningful opportunity for release from prison within his expected lifetime."[11]

---

[9] The issues discussed below are presently under review by our Supreme Court in *In re Alatriste*, review granted February 19, 2014, S214652 and *In re Bonilla*, review granted February 19, 2014, S214960.

[10] Although defendant frames the issue in terms of his trial attorney's ineffective assistance of counsel, we elect to reach the issue as a new development in the law since defendant's sentencing.

[11] The People conceded that defendant's "minimum parole eligibility date would fall approximately 65 years and 10 months after sentencing, in approximately November 2076, just after [defendant] turns 83 years old." The People further asserted that defendant's expected lifespan was approximately 80 years. Based on this, the People conceded that defendant's sentence was the functional equivalent of a life sentence without parole.

We note that the People's concession is based on an erroneous calculation of the length of defendant's sentence. According to the People, defendant was sentenced to "an aggregate indeterminate term of 62 years to life plus an aggregate determinate term of six years" -- for a total of 68 years to life. As we have shown, however, defendant was actually sentenced to an aggregate terms of 61 years to life, including both the determinate and indeterminate terms imposed by the court.

Following the passage of Senate Bill No. 260 (2013-2014 Reg. Sess.) Statutes 2013, chapter 312 (Senate Bill No. 260), we requested supplemental briefing on whether that legislation rendered defendant's challenge to his sentence moot. The People contend it did; defendant disagrees. We agree with defendant and conclude that his sentence must be reversed and the case remanded for reconsideration in light of our Supreme Court's guidance in *Caballero* even after the passage of Senate Bill No. 260.

A

*Life Sentences For Nonhomicide Crimes Committed By Minors*

In *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*), the United States Supreme Court announced that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Id.* at p. 81 [176 L.Ed.2d at p. 850].) Two years later, in *Miller*, the Supreme Court declared, " '[j]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his [or her]

---

On our own motion, we take judicial notice of the National Vital Statistics Reports, United States Life Tables, 2008, which shows that defendant's life expectancy at the time he was sentenced, when he was 17 years old, was somewhere in the vicinity of 77 years (using the table for males) to 79 years (using the table for Hispanic males). (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 534, fn. 7.) Taking into account the amount of presentence credits defendant was awarded -- one year and three months -- and the length of his minimum term -- 61 years -- it appears that at the time of his sentencing, it could have been reasonably expected that defendant would be 77 years old before he was eligible for parole. On this evidence, and given the People's concession (even though it was based on a calculation error), we conclude that defendant's sentence did not give him a meaningful opportunity for release from prison within his expected lifetime, and thus his sentence is subject to the decisions we discuss herein.

15

culpability." (*Miller*, *supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 422], quoting *Eddings v. Oklahoma* (1982) 455 U.S. 104, 116, [71 L.Ed.2d at p. 12].) The *Miller* court recognized it "imposed a categorical ban on the sentence's use, in a way unprecedented for a term of imprisonment. See [*Graham*, *supra*,] . . . 176 L.Ed.2d 825 (Thomas, J., dissenting) ('For the first time in its history, the Court declares an entire class of offenders immune from a noncapital sentence using the categorical approach it previously reserved for death penalty cases alone')." (*Miller*, at p. ___ [183 L.Ed.2d at p. 421].)

Following *Graham* and *Miller*, the California Supreme Court held a 110-year-to-life sentence imposed for three counts of attempted murder committed as a minor constituted cruel and unusual punishment. (*Caballero*, *supra*, 55 Cal.4th at p. 265.) As the *Caballero* court explained, "the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.' (*Graham*, *supra*, 560 U.S. at p. ___ [130 S.Ct. at pp. 2029–2030].) The court observed that a life without parole sentence is particularly harsh for a juvenile offender who 'will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender.' (*Id.* at p. ___ [130 S.Ct. at p. 2028].) *Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society. (*Ibid.*)" (*Caballero*, *supra*, 55 Cal.4th at p. 266.)

In *Caballero*, the Attorney General argued the 110-year-to-life prison sentence for a minor did not violate the Eighth Amendment even though it was the "functional equivalent to a life without parole term" on grounds no individual component of the defendant's sentence by itself amounted to a life sentence. (*Caballero*, *supra*, 55 Cal.4th at p. 271.) Our Supreme Court rejected the contention because "the purported distinction

between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive." (*Id.* at pp. 271-272.) Thus, the *Caballero* court reversed the sentence and instructed that "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' " (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. 43 at p. 74 [176 L.Ed.2d at p. 831].)

B

*Senate Bill No. 260 Does Not Cure The Constitutional Error In Sentencing*

The Legislature responded to *Miller* and *Caballero* by passing Senate Bill No. 260, which became effective on January 1, 2014. The Legislature noted the bill "recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Sen. Bill No. 260 (2013-2014 Reg. Sess.) § 1.) The Legislature declared, "[t]he purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*], and [*Miller*]. It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Sen. Bill No. 260 (2013-2014 Reg. Sess.) § 1.)

17

To effectuate the Legislature's intent, Senate Bill No. 260 added section 3051 to the Penal Code, which requires the Board of Parole Hearings to conduct youth offender parole hearings during the 15th, 20th, or 25th year of incarceration. (Pen. Code, § 3051, subd. (b).) A youthful offender whose sentence is a term of 25 years to life or greater is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (Pen. Code, § 3051, subd. (b)(3); Sen. Bill No. 260 (2013-2014 Reg. Sess.) § 4.) In conducting youth offender parole hearings under Penal Code section 3051, the Board of Parole Hearings is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (Pen. Code, § 4801, subd. (c).) If the youthful offender is found suitable for parole by the Board of Parole Hearings, he or she must be released even if the full determinate term originally imposed has not yet been completed. (Pen. Code, § 3046, subd. (c).)

In light of defendant's newly enacted entitlement to a youth offender parole hearing during his 25th year of incarceration, the Attorney General contends defendant's sentence "is constitutional because he now has a realistic opportunity to obtain release from prison during his lifetime." We conclude remand for resentencing is compelled by the Eighth Amendment.

In *Caballero,* the California Supreme Court concluded: "Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, *the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life*, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a

18

direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, italics added.)

Even though Senate Bill No. 260 provides what may be considered a "safety net" providing a juvenile offender the opportunity for a parole hearing during his or her lifetime, the new legislation does not substitute for the sentencing court's consideration of all individual characteristics of the offender. In *Miller*, the United States Supreme Court held imposition of punishment for crimes committed as a juvenile constitutes a task "demanding individualized sentencing . . . ." (*Miller*, *supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 421].) After noting its earlier decisions requiring consideration of the mitigating and aggravating factors unique to each case of sentencing for crimes committed as a minor, the *Miller* court emphasized that, "[o]f special pertinence here, we insisted in these rulings that *a sentencer have the ability to consider the 'mitigating qualities of youth.'* " (*Id*. at p. ___ [183 L.Ed.2d at p. 422] italics added, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367 [125 L.Ed.2d 290, 306].) Consequently, Senate Bill No. 260 does not render defendant's claim moot.

The possibility that defendant will have a board of parole undertake an evaluation 25 years after his sentencing is not a substitute for the trial court's evaluation at sentencing. Although the trial court is not required to articulate the analysis of *Miller*, *Graham*, and *Caballero* as it relates to every youthful offender, each youthful offender is entitled to a sentence that passes muster under the Eighth Amendment. Moreover, a properly imposed sentence by itself can prove instructive in indicating the trial court's conclusions about the youthful offender's level of development, culpability, and other relevant factors. When youthful offenders must ultimately show achievement of sufficient growth and maturity to secure release on parole, they will need to refer back to the circumstances that existed at the commission of the crimes and were apparent to the

19

trial court at sentencing.  (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)  Without a proper evaluation by the trial court, youthful offenders will be deprived of their constitutionally guaranteed evaluation at the time of their sentencing and again when attempting to meet their burden during the much later youth parole hearings.  (*Ibid.*)  Consequently, we adhere to the guidance of the United States and California Supreme Courts that the sentencing court must engage in the proper evaluation of the appropriate punishment for a youthful offender.  (*Miller*, *supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 407]; *Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)

The question of whether remand for resentencing must be ordered in this case is additionally informed by the California Supreme Court's recent examination of constitutionally deficient sentencing for youthful offenders in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).  *Gutierrez* involved consolidated cases in which two defendants, Gutierrez and Moffett, each separately committed special circumstance murder while 17 years old.  (*Id.* at pp. 1360-1361.)  The trial court imposed life without the possibility of parole (LWOP) sentences on each defendant under Penal Code section 190.5, subdivision (b), which had been construed to create a presumption in favor of LWOP sentences for special circumstance murders committed by 16- and 17-year-old offenders.  (*Gutierrez*, at p. 1360.)  In *Gutierrez*, the California Supreme Court harmonized Penal Code section 190.5, subdivision (b), with Eighth Amendment protections by holding trial courts have discretion to sentence a youthful offender to serve 25 years to life or LWOP with no presumption in favor of the LWOP option.  (*Gutierrez*, at pp. 1371-1379.)

Because the defendants in *Gutierrez* had been sentenced under the prior, prevailing presumption in favor of LWOP, the Supreme Court held that resentencing was required.  (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1361, 1379.)  In so holding, the *Gutierrez* court rejected the People's argument that the recent enactment of Penal Code section 1170, subdivision (d)(2), "removes life without parole sentences for juvenile

20

offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez*, at p. 1386.) Penal Code section 1170 allows a youthful offender to petition the court to recall the sentence after serving 15 years. (*Id.* at p. 1384; see also *id*. at p. 1385 [noting also that the youthful offender, if not initially successful, may petition again after 20 and 24 years have been served].) The *Gutierrez* court explained that the United States Supreme Court in "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to -- not as an after-the-fact corrective for--'*making the judgment at the outset* that those offenders never will be fit to reenter society.' (*Graham*, at p. 75, italics added.) Likewise, *Miller*'s 'cf.' citation to the 'meaningful opportunity' language in *Graham* occurred in the context of prohibiting 'imposition of that harshest prison sentence' on juveniles under a mandatory scheme. (*Miller*, at p. ___ [132 S.Ct. at p. 2469].) Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' (*Graham*, at p. 75.) [¶] Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance: 'Even if the State's judgment that *Graham* was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset*.' (*Graham, supra*, 560 U.S. at p. 73, italics added.) By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to [Penal Code] section 1170(d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous. Consistent with *Graham*,

*Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.'  (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2471], italics added; see *id*. at pp. ___, ___ [132 S.Ct. at pp. 2469, 2475].)"  (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1386-1387.)  In short, the California Supreme Court recognized a statutory promise of future correction of a presently unconstitutional sentence does not alleviate the need to remand for resentencing that comports with the Eighth Amendment.

Consequently, we reverse and remand "the case to the trial court with directions to resentence defendant to a term that does not violate his constitutional rights, that is, a sentence that, although undoubtedly lengthy, provides him with a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' (*Graham*, 560 U.S. at p. ___ [130 S.Ct. at p. 2030].)"  (*Caballero*, *supra*, 55 Cal.4th at p. 273 (conc. opn. of Werdegar, J.).)

DISPOSITION

The judgment is reversed and the case is remanded for resentencing consistent with *Caballero*.


        ROBIE        , J.


I concur:


      HOCH       , J.

Nicholson, Acting P. J., Dissenting.

I respectfully dissent.

The majority reverses for resentencing based on language in *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*), *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] (*Miller*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). I do not believe that reversal is required even if, applying the after-acquired wisdom of *Graham, Miller,* and *Caballero*, the trial court erred by sentencing defendant to a term that is the functional equivalent of a sentence of life without parole. No reversal is required because, since the enactment of Senate Bill No. 260 (Pen. Code, § 3051), his sentence is no longer the functional equivalent of a sentence of life without parole. The later-legislated limit of 25 years to life for a juvenile nonhomicide offender eliminates the concerns of the high courts in *Graham, Miller,* and *Caballero* and renders our expenditure of further time and resources on the issue both unnecessary and imprudent.

To explain, I must put the issue in context.

The Eighth Amendment categorically bans imposition of a sentence of life without parole on a juvenile nonhomicide offender. (*Graham, supra,* 560 U.S. at p. 75.) The Eighth Amendment also categorically bans imposition of the functional equivalent of a sentence of life without parole on a juvenile nonhomicide offender. (*Caballero, supra,* 55 Cal.4th at p. 268.) That summarizes *Graham* and *Caballero*.

*Miller* dealt with whether the Eighth Amendment allowed *mandatory* imposition of a term of life without parole on a juvenile *murderer*. (*Miller, supra,* 567 U.S. at pp. ___ [183 L.Ed.2d at pp. 414-415].) The court held that a life-without-parole term cannot be mandatory, but such a term is permissible if the term is discretionary and the court takes into account certain relevant circumstances. *Miller* summarized those circumstances as follows (which I call the *Miller* factors):

1

"Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features -- among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him -- and from which he cannot usually extricate himself -- no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth -- for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  [Citations.]  And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it."  (*Miller, supra,* 567 U.S. at p. ___ [183 L.Ed.2d at p. 423].)

*Miller* did not hold that every court sentencing any juvenile must consider the *Miller* factors.  It pertained only to the discretionary determination of whether a juvenile murderer should be sentenced to a term of life without parole.  Therefore, quoting *Miller* in a case of a juvenile offender who did not commit homicide misapplies that *Miller* requirement.  In fact, no amount of considering the *Miller* factors with respect to a juvenile who did not commit homicide can justify imposing a sentence of life without parole because the high court, in *Graham*, categorically banned such sentences for juveniles who committed crimes short of homicide.

*Caballero* applied *Graham*, according to the first and last paragraphs in the *Caballero* opinion.  (*Caballero, supra,* 55 Cal.4th at pp. 266, 268-269.)  Since the Eighth Amendment categorically bans a term of life without parole for a juvenile who did not commit homicide, reasoned the California high court, it also categorically bans the functional equivalent of a term of life without parole.  (*Id.* at p. 268.)

2

While it is true that *Caballero* includes statements about what a *sentencing court* must consider when imposing a sentence on a juvenile nonhomicide offender, those statements are dicta. (*Caballero, supra,* 55 Cal.4th at pp. 266, 268-269.) The holding of *Caballero*, the sole ratio decidendi, is that the Eighth Amendment categorically bans the functional equivalent of life without parole sentences for juvenile nonhomicide offenders. Again, no amount of considering the *Miller* factors can justify imposing a term of life without parole or its functional equivalent on a juvenile nonhomicide offender.

On the other hand, there is no authority that the Eighth Amendment bans a legislature from prescribing a mandatory term of 25 years to life for a juvenile convicted of heinous crimes short of homicide. (*People v. Dillon* (1983) 34 Cal.3d 441 is an outlier confined to its own facts.) Such a sentence is not a term of life without parole or the functional equivalent of life without parole and, therefore, *Graham*, *Miller*, and *Caballero* are not implicated. So why cannot the Legislature impose such a term retrospectively and eliminate Eighth Amendment concerns? I believe it can and did.

With these thoughts in mind, I believe the majority misreads *Graham, Miller,* and *Caballero*.

The majority concludes that Senate Bill No. 260 does not eliminate the necessity of reversing and remanding for resentencing a functional equivalent of a life-without-parole sentence for a youthful nonhomicide offense. It determines that the trial court must resentence the youthful defendant. In making this determination, the majority uses statements in *Miller* and *Caballero* about how the sentencing court must consider factors pertaining to the defendant's age. This approach, however, ignores the actual holdings of *Miller* and *Caballero*. *Miller* related to discretionary sentencing of a juvenile murderer to a term of life without parole, and, as I have already said, the language now cited from *Caballero* is dicta. Also, the statements in *Caballero* concerning what the sentencing court must consider pertained to the law as it existed at the time *Caballero* was decided,

3

with the possibility that a youthful nonhomicide offender might be subject to a sentence that is the functional equivalent of a term of life without parole.

But now the law has changed. With the passage of Senate Bill No. 260, as recounted in the majority opinion, no defendant who committed a nonhomicide offense as a juvenile is currently subject to the functional equivalent of a life-without-parole sentence because the possibility for parole exists after 25 years of incarceration, at the latest. Since there can be no dispute that a sentence of 25 years to life is not the functional equivalent of a life-without-parole sentence for a juvenile, there is no Eighth Amendment problem, at least as it relates to *Graham, Miller,* and *Caballero*.

The majority relies in part on *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), which is a case involving life without parole for special circumstance *murder*, a homicide offense. In *Gutierrez*, the California Supreme Court found that California's special circumstance law, Penal Code section 190.5, subdivision (b), does not violate the Eighth Amendment because it does not impose a mandatory sentence of life without parole, neither does it create a presumption of life without parole. However, because the sentencing court did not know that there was no presumption for a life-without-parole sentence, as opposed to a term of 25 years to life, the Supreme Court reversed and remanded for resentencing. (*Id*. at pp. 1360-1361.)

The different, though also later-legislated, scheme considered in *Gutierrez* provides a youthful *homicide* offender the opportunity to petition for recall of the sentence after 15 years of incarceration and assigns to the youthful offender the burden of showing rehabilitation. (Pen. Code, § 1170, subd. (d)(2); *Gutierrez, supra,* 58 Cal.4th at p. 1384.) The court held that this sentence recall scheme did not alleviate the need to remand for resentencing. It said: "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to – not as an after-the-fact corrective for – '*making the judgment at the outset* that those offenders never will be fit to reenter society.' (*Graham*, at p. 75, italics added.)

4

Likewise, *Miller's* "cf." citation to the 'meaningful opportunity' language in *Graham* occurred in the context of prohibiting 'imposition of that harshest prison sentence' on juveniles under a mandatory scheme. (*Miller*, at p. ___ [132 S.Ct. at p. 2469].) Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' (*Graham*, at p. 75.)" (*Gutierrez, supra,* 58 Cal.4th at p. 1386.)

This text from *Gutierrez* superficially seems to support remand in a case of a youthful *nonhomicide* offender subject to the functional equivalent of a life-without-parole sentence, despite the enactment of Senate Bill No. 260. But a close look at the two recent statutes in question exposes the folly of equating them.

Penal Code section 1170, subdivision (d)(2), at issue in *Gutierrez*, gives a youthful homicide offender the opportunity to petition the sentencing court for recall of the sentence after 15 years. In other words, the statute does not have the effect of modifying the sentence. Instead, it provides an opportunity, later, to petition to be resentenced, which opportunity can be lost by failing to file a petition to recall the sentence.

Senate Bill No. 260, on the other hand, makes a youthful offender *eligible for release on parole* after the prescribed number of years, at most 25. (Pen. Code, § 3051, subd. (b).) The youthful offender need not file any petition because the youthful offender parole board is required to hold the parole hearing (Pen. Code, § 3051, subd. (d)), which makes the situation the functional equivalent of having been sentenced to 25 years to life originally (since we are talking about functional equivalents).

The majority does not acknowledge the considerable difference between the two schemes. Under the Penal Code section 1170, subdivision (d)(2) scheme, the life-without-parole sentence is unaltered if the youthful offender fails to file the petition or fails to establish rehabilitation. Under the Senate Bill No. 260 scheme, however, the

youthful offender's sentence is effectively changed to a sentence of 25 (or less) years to life because the parole eligibility and hearing are automatic.

Therefore, neither *Gutierrez* nor reason support a remand for resentencing after enactment of Senate Bill No. 260 in the case of a youthful nonhomicide offender sentenced to the functional equivalent of life without parole. Defendant here is not currently subject to a sentence that is the functional equivalent of life without parole; therefore, his punishment is neither cruel nor unusual – that is, it does not violate the Eighth Amendment.

One final consideration bears mention. The majority remands for resentencing to a term that does not violate the Eighth Amendment. The majority, however, does not and cannot give the trial court authority to impose a sentence that is not authorized by statute. In any event, any term the trial court imposes on remand, even the term already imposed, will comply with the Eighth Amendment because, by law, defendant will have a meaningful opportunity to obtain release within his lifetime.

I would affirm.


      NICHOLSON      , Acting P. J.

6